UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on January 28, 2021

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-cr-\_\_\_\_\_** |
| | : | |
| v. | : | **GRAND JURY ORIGINAL** |
| | : | |
| **TERENCE SUTTON and** | : | **VIOLATIONS:** |
| **(Counts 1, 2, 3)** | : | |
| | : | D.C. Code § 22-2103 |
| **ANDREW ZABAVSKY,** | : | (Murder in the Second Degree) |
| **(Counts 2, 3)** | : | |
| | : | 18 U.S.C. § 371 |
| Defendants. | : | (Conspiracy) |
| | : | |
| | : | 18 U.S.C. §§ 1512(b)(3), 2 |
| | : | (Obstruction of Justice) |
| | : | |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates and at the approximate times stated below:

## BACKGROUND

### Introduction

1.      On October 23, 2020, Karon Hylton-Brown—a 20 year-old born and raised in the Brightwood Park neighborhood of the District of Columbia—suffered severe head trauma from a traffic collision caused by a police vehicular pursuit. Fewer than two days later, on October 25, he died from his injuries.

2.      This Indictment alleges that TERENCE SUTTON, a sworn Metropolitan Police Department (MPD) officer, committed Murder in the Second Degree, in violation of D.C. Code

§ 22-2103—that is, SUTTON caused Hylton-Brown's death by driving a police vehicle in conscious disregard for an extreme risk of death or serious bodily injury to Hylton-Brown.

3. This Indictment further alleges that SUTTON and ANDREW ZABAVSKY, SUTTON's supervising MPD lieutenant, conspired to obstruct justice, in violation of 18 U.S.C. § 371, and that they obstructed justice, and aided and abetted each other in doing so, in violation of 18 U.S.C. §§ 1512(b)(3), 2—that is, SUTTON and ZABAVSKY combined to hide from MPD officials the circumstances of the traffic collision leading to Hylton-Brown's death, to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation.

4. Under D.C. Code § 11-502(3) this Court has pendent jurisdiction over the charge of Murder in the Second Degree.

## The Defendant Police Officials

5. MPD is the primary law enforcement agency for the District of Columbia. MPD General Orders provide that "[i]t is the policy of the MPD to ensure its members preserve the peace, protect life and property, prevent crime, apprehend offenders, recover property and enforce all laws and ordinances of the District of Columbia and the United States of America." MPD General Order No. 201.26, Pt. II.

6. SUTTON was a police officer assigned to the Crime Suppression Team (CST) in MPD's Fourth Police District. He had more than ten years of experience on the police force.

7. ZABAVSKY was a lieutenant that supervised the Fourth Police District's CST officers, including SUTTON. ZABAVSKY was responsible for ensuring that officers under his supervision complied with MPD policies and procedures. In addition, ZABAVSKY's duties

included reporting sensitive incidents to the MPD management chain above him. He had 18 years of experience on the police force.

8. SUTTON and ZABAVSKY knew the MPD policy regarding vehicular pursuits. MPD General Orders define a police vehicular pursuit as "an attempt by a member of this Department to apprehend a fleeing felon while in an authorized emergency vehicle with all emergency warning devices activated" and prohibit officers from "pursuing a vehicle for the purpose of affecting a stop for a traffic violation." General Order No. 301.03, Pts. III.2 and IV.F. MPD General Orders state that "members and officials shall continually evaluate and assess the actual conditions of the pursuit in deciding whether to continue or discontinue the vehicular pursuit." General Order No. 301.03, Pt. II.

9. The District of Columbia Municipal Regulations afford authorized emergency vehicles, including police vehicles, certain privileges not afforded to ordinary citizens. Those privileges, however, do not relieve police officers "from the duty to drive with due regard for the safety of all persons, nor shall these provisions protect the driver from the consequences of his reckless disregard for the safety of others." DCMR § 18-2002.4.

### The Vehicular Pursuit That Caused Karon Hylton-Brown's Death

10. Just after 10:00 p.m. on Friday, October 23, 2020, SUTTON—driving his unmarked police vehicle with three other officers—and ZABAVSKY—alone in his marked police vehicle—tried to stop Hylton-Brown, who was driving a moped, without a helmet, on the sidewalk. Driving a moped on the sidewalk and riding a moped without a helmet are municipal traffic violations. When Hylton-Brown did not stop, SUTTON and ZABAVSKY both activated the emergency lights on their vehicles and pursued him.

11. For more than three minutes, SUTTON pursued Hylton-Brown through neighborhood streets with pedestrians and other vehicles present. At times, SUTTON accelerated to more than double the residential speed limit, at one point reaching 45 miles per hour (mph). SUTTON pursued Hylton-Brown for more than ten blocks, driving the wrong way on a one-way street and passing through multiple "STOP" signs.

12. At the outset, ZABAVSKY assisted in initiating the pursuit with his emergency lights activated and overtook SUTTON as the primary pursuit vehicle behind Hylton-Brown for about one block. After several blocks, ZABAVSKY separated from the direct pursuit, but drove in a parallel path of travel that positioned him on the 700 block of Kennedy Street, N.W., where he could intercept Hylton-Brown from a different direction. SUTTON and ZABAVSKY regularly announced location updates that were communicated over a closed police radio channel. This channel was not broadcast to the communications dispatcher responsible for coordinating vehicle pursuits or the District Watch Commander, the MPD official to whom ZABAVSKY reported.

13. The pursuit ended when SUTTON followed Hylton-Brown into an alleyway, deactivated his police vehicle's emergency lights and sirens, and accelerated behind Hylton-Brown as Hylton-Brown approached the alleyway's exit onto the 700 block of Kennedy Street. Immediately upon entering the street, Hylton-Brown was struck by an oncoming civilian vehicle. The impact ejected Hylton-Brown off the moped and across the full width of the alley, in plain view of SUTTON. ZABAVSKY—who seconds before the collision had initiated a U-turn less than half a block away that positioned him to face the mouth of the alleyway—arrived at the scene approximately 16 seconds after the impact.

14. Hylton-Brown lay in the street motionless, unconscious, and with a pool of blood collecting underneath his head. Neither ZABAVSKY, the highest-ranking police official at the

scene, nor SUTTON, the officer who pursued Hylton-Brown onto Kennedy Street, made notifications about Hylton-Brown's condition to MPD's Major Crash Section (MCS)—the MPD component responsible for investigating traffic crashes involving serious bodily injury or death. Nor did SUTTON or ZABAVSKY apprise any official in the MPD chain-of-command of Hylton-Brown's serious injuries, the fact that a vehicle pursuit preceded the traffic collision that resulted in the injuries, or their involvement in the pursuit. These actions delayed, and could have prevented, notifications to MCS and the Internal Affairs Division (IAD), which is responsible for making referrals to federal authorities for investigations of potential criminal civil rights violations.

15. SUTTON and ZABAVSKY took control of the scene and deliberately neglected to execute their duties properly. SUTTON and ZABAVSKY agreed that SUTTON would prepare the traffic crash report. Neither SUTTON nor ZABAVSKY took routine steps to collect evidence relevant to a traffic crash investigation, including preserving the scene, collecting witness information, or interviewing witnesses. Fewer than 21 minutes after the collision, before leaving the scene, SUTTON and ZABAVSKY deactivated their MPD-issued body-worn cameras (BWCs) and conferred privately.

16. After leaving the scene, SUTTON and ZABAVSKY returned to the Fourth District police station. Once there, they provided a misleading account of the incident to the Watch Commander. SUTTON denied engaging in a vehicular pursuit of Hylton-Brown, ZABAVSKY withheld all information about his involvement in the incident, and both officers omitted any mention of Hylton-Brown's serious injuries. Because of their misleading account, no investigation by other MPD components, including MCS and IAD, was initiated at that time.

17. For the next 30 or more minutes, SUTTON and ZABAVSKY obtained multiple updates on Hylton-Brown's worsening medical condition, including that Hylton-Brown required

a breathing tube, had a skull fracture, and was in critical condition. Only after receiving these details did ZABAVSKY reveal to the Watch Commander information about Hylton-Brown's serious injuries. In response to a question from the Watch Commander, ZABAVSKY still maintained that he did not know whether SUTTON had engaged in a police vehicular pursuit. The Watch Commander reviewed the BWC himself and immediately directed ZABAVSKY to contact MCS. The Watch Commander then called IAD himself.

18. On October 25, 2020, Hylton-Brown died from his injuries.

## COUNT ONE
### (Murder in the Second Degree—D.C. Code § 22-2103)

19. The allegations in paragraphs 1 through 18 are realleged and incorporated as if fully set forth herein.

20. On the night of October 23, 2020, Hylton-Brown drove a borrowed Revel rental moped through Brightwood Park. He was not wearing a helmet. The maximum speed of a Revel moped is 30 mph.

21. SUTTON and ZABAVKSY drove their MPD vehicles eastbound on Kennedy Street into the 400 block and passed Hylton-Brown. Both SUTTON and ZABAVSKY made a U-turn to drive back toward Hylton-Brown.

22. As SUTTON and ZABAVKSY started driving westbound on Kennedy Street toward Hylton-Brown, Hylton-Brown began driving the moped on the sidewalk westbound on Kennedy Street, away from SUTTON and ZABAVSKY.

23. At the intersection of Kennedy and Fifth Streets, SUTTON and ZABAVSKY activated the emergency lights on their MPD vehicles and attempted to stop Hylton-Brown.

24. Hylton-Brown turned southbound on Fifth Street. SUTTON and ZABAVKSY pursued Hylton-Brown in their MPD vehicles with their emergency lights still activated.

25. Hylton-Brown briefly slowed down at a parking lot entrance on Fifth Street, and SUTTON and ZABAVKSY also slowed down. Hylton-Brown then drove away on the moped, continuing southbound on Fifth Street.

26. SUTTON and ZABAVSKY continued to pursue Hylton-Brown in their MPD vehicles. The vehicular pursuit spanned ten city blocks and more than three minutes, ending in the traffic collision in which Hylton-Brown suffered fatal injuries. Throughout the pursuit, SUTTON and ZABAVSKY used a police radio channel broadcast only to CST officers, and not the communications dispatcher or the Watch Commander, to communicate about their locations. During the more than three-minute pursuit:

   a. ZABAVSKY took the lead car position for approximately one block at the start of the pursuit, during which time he was the only officer with activated emergency lights and sirens;

   b. ZABAVSKY announced Hylton-Brown's position to CST officers over the radio, stating: "Seventh and Ingraham. We're chasing Karon on a scooter right now.";

   c. ZABAVSKY took a separate but parallel path of travel that positioned him to intercept Hylton-Brown in the 700 block of Kennedy Street;

   d. SUTTON pursued Hylton-Brown the wrong way up a one-way street for two blocks;

   e. SUTTON drove through seven "STOP" signs;

   f. At multiple intersections where Hylton-Brown remained at a slow or stopped pace, SUTTON accelerated toward Hylton-Brown and then slammed on his brakes;

7

g.  SUTTON pursued Hylton-Brown through two alleyways, driving more than 10 mph above the 15 mph speed limit in each, and reaching a top speed of 40 mph in the first alleyway;

h.  SUTTON accelerated to speeds between 11 mph and 25 mph above the speed limit, at one point hitting a top speed of 45 mph when driving the wrong way on a one-way street; and,

i.  SUTTON intermittently used his emergency lights and sirens throughout the pursuit.

27.  In the final ten seconds of the pursuit, SUTTON pursued Hylton-Brown into an alleyway that connects the 700 blocks of Jefferson and Kennedy Streets. The alleyway is 14 feet wide at its narrowest point when approaching Kennedy Street. When SUTTON entered the alleyway, he deactivated his emergency lights and momentarily used his siren before turning it off. As Hylton-Brown approached Kennedy Street, SUTTON accelerated to 26 mph, closing in on Hylton-Brown's moped.

28.  Hylton-Brown drove onto Kennedy Street and was immediately struck by an oncoming automobile traveling westbound. The impact hurled Hylton-Brown off the moped, across the width of the mouth of the alleyway. He landed in the street, where he lay unconscious and motionless, with a gash on his face, and blood pooling around his head. He never regained consciousness.

29. On October 23, 2020, in the District of Columbia, the defendant,

**TERENCE SUTTON,**

acting with conscious disregard of an extreme risk of death and serious bodily injury to Karon Hylton-Brown, caused Hylton-Brown's death—that is, as described above, SUTTON caused a traffic collision from which Hylton-Brown sustained injuries and died.

(In violation of Title 22, D.C. Code, Section 22-2103)

## COUNT TWO
### (Conspiracy—18 U.S.C. § 371)

30. The allegations in paragraphs 1 through 18 and 20 through 28 are realleged and incorporated as if fully set forth herein.

### The Conspiracy

31. Between October 23, 2020, and October 24, 2020, in the District of Columbia, the defendants,

**TERENCE SUTTON and**
**ANDREW ZABAVSKY,**

did knowingly combine, conspire, confederate, and agree with each other to commit an offense against the United States—that is, to engage in misleading conduct toward another person with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States information relating to the commission and possible commission of a Federal offense, in violation of Title 18, United States Code, Section 1512(b)(3), as charged in Count Three of this Indictment.

### Purpose of the Conspiracy

32.     The purpose of the conspiracy was for SUTTON and ZABAVSKY to hide from MPD officials the circumstances of the traffic collision leading to Hylton-Brown's death, to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation.

### Manner and Means of the Conspiracy

33.     SUTTON and ZABAVSKY carried out the conspiracy through the following manner and means, among others:

    a.     Delaying notification of the traffic collision to MPD officials and, in turn, federal authorities;

    b.     Controlling the law enforcement response to the traffic crash scene;

    c.     Willfully neglecting to collect and preserve relevant evidence; and,

    d.     Withholding information from the Watch Commander and misleading him about the circumstances of the traffic collision.

### Overt Acts

34.     ZABAVSKY, the most senior MPD official on the traffic crash scene, waited more than three minutes after the collision to communicate with the communications dispatcher, and did so only after the dispatcher requested the identity of the official in charge of the scene.

35.     Despite being the most senior official on scene, ZABAVSKY made no notifications to MCS, IAD, or any senior MPD officials.

36.     Nine minutes after the collision, SUTTON and ZABAVSKY agreed that SUTTON would write the police report for the incident.

37. SUTTON told an MPD officer, who had not been involved in the pursuit of Hylton-Brown, and who had already started gathering information for a police report, that SUTTON would write the report.

38. ZABAVSKY also told the uninvolved MPD officer that SUTTON would write the police report.

39. ZABAVSKY obtained no witness statements, nor did he direct any other officer to take statements, despite being approached by at least one individual who asserted he was an eyewitness.

40. SUTTON obtained no witness statements other than basic information from the driver of the striking vehicle that had already been gathered by another officer. Nor did he direct any other officer to memorialize witness statements, despite being approached by at least one individual who asserted he was an eyewitness.

41. Twenty minutes after the collision, SUTTON gave permission to the driver of the vehicle that struck Hylton-Brown to leave the scene with his vehicle, despite considerable damage to the vehicle.

42. Fewer than 21 minutes after the collision, SUTTON and ZABAVSKY turned off their BWCs, stood apart from all other officers, engaged in a private conversation, and then immediately left the scene to return to the Fourth District police station.

43. When ZABAVSKY left the scene, he did not leave any other police official in charge.

44. When SUTTON left the scene, he drove his MPD vehicle from the location where it had come to a stop at the time of the collision.

45. When SUTTON left the scene, he drove his MPD vehicle directly over physical evidence from Hylton-Brown's moped.

46. At the Fourth District police station, SUTTON and ZABAVSKY met with the Watch Commander, the senior-most official in charge, and provided him with a misleading account of the incident:

    a. SUTTON and ZABAVSKY portrayed the incident as a brief attempted traffic stop from which a moped driver took off and was then hit by a vehicle;

    b. SUTTON minimized his conduct, saying that he did not engage in a vehicular pursuit;

    c. ZABAVSKY said that he did not know if SUTTON had engaged in a vehicular pursuit;

    d. ZABAVSKY withheld information concerning his own involvement in the pursuit;

    e. ZABAVSKY said that Hylton-Brown had been drunk and had been slurring his words; and,

    f. SUTTON and ZABAVSKY withheld all information about Hylton-Brown's serious injuries.

47. SUTTON drafted a traffic crash report that minimized the extent of the observable injuries to Hylton-Brown.

48. ZABAVSKY continued to withhold from the Watch Commander all information about Hylton-Brown's serious injuries and updates about his condition, despite knowing that it was critical and worsening.

(In violation of Title 18, United States Code, Section 371)

## COUNT THREE
## (18 U.S.C. §§ 1512(b)(3), 2—Obstruction of Justice)

49. The allegations in paragraphs 1 through 18, 20 through 28, and 34 through 48 are realleged and incorporated as if fully set forth herein.

50. Between October 23, 2020, and October 24, 2020, in the District of Columbia, the defendants,

**TERENCE SUTTON and
ANDREW ZABAVSKY,**

aiding and abetting each other, knowingly engaged in misleading conduct toward another person, and attempted to do so, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States information relating to the commission and possible commission of a Federal offense—that is, SUTTON and ZABAVSKY hid from MPD officials the circumstances of the traffic collision leading to Karon Hylton-Brown's death, to prevent an internal investigation of the incident and referral of the matter to federal authorities for a criminal civil rights investigation.

(In violation of Title 18, United States Code, Sections 1512(b)(3) and 2))

A TRUE BILL

FOREPERSON

CHANNING D. PHILLIPS
ACTING U.S. ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA