UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 21-cr-598-PLF |
| | : | |
| v. | : | |
| | : | |
| TERENCE SUTTON and | : | |
| ANDREW ZABAVSKY | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE INADMISSIBLE EXPERT TESTIMONY

At the July 26, 2022, hearing before the Court, counsel for defendant Sutton stated that he did not believe expert testimony is admissible in this case. The government agrees. The experts that the defendants have noticed seek to introduce testimony that is wholly inadmissible under Federal Rules of Evidence 702, 703, 704, 401, 403, and 801(c), and their testimony should be excluded outright. Substantial deficiencies in the expert disclosure for one of these witnesses, which renders the government unable to present a complete challenge to his anticipated testimony, also provides an independent basis for excluding him. Alternatively, the government respectfully requests that this Court require the defendants to present all five witnesses at a *Daubert* hearing. For the reasons that follow, this motion should be granted.

### LEGAL STANDARD

#### A. **Admissibility of Expert Testimony**

Federal Rules of Evidence 702, 703, and 704 establish the basic parameters for expert witness testimony. Rule 702 permits a witness who is qualified as an expert to testify in the form of an opinion if the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To be

admissible at trial, expert testimony "must be helpful to the trier of fact" and cannot serve to "merely tell the jury what result to reach." Fed. R. Evid. 704, Advisory Committee Notes.

Applying these rules, the Supreme Court has held that expert testimony must be excluded if: (1) it is not reliable; or (2) it is not relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (observing that Rule 702 assigns to the trial judge the task of ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). This test ensures that each testifying expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert's opinion testimony will be excluded as unreliable if the expert is unqualified to provide the opinion, if the expert did not base the opinion on sufficient facts or data or employ reliable methods and principles, or if the expert did not reasonably apply appropriate methods and principles to the facts of the case. Fed. R. Evid. 702 (requiring expert testimony to meet these standards); *see Kumho Tire*, 526 U.S. at 155-56 (affirming exclusion of expert testimony based upon unreliable methodology); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F.Supp.3d 14, 53 (D.D.C. 2017) (Friedman, J.) (excluding opinion testimony that exceeded the scope of the expert's expertise).

In a criminal case, Rule 704 further prohibits an expert from providing an opinion "about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged." Fed. R Evid. 704(b). Rather, "[t]hose matters are for the trier of fact alone." *Id.* An expert also may not testify to legal conclusions, as such testimony does not properly assist the jury in understanding the evidence or determining any fact at issue—Rule 702's stated purpose for allowing expert testimony. *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d

1207, 1212 (D.C. Cir. 1997) ("Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not 'otherwise admissible' [under Rule 704]."). An expert who testifies to legal conclusions improperly infringes on the Court's role in presiding over the trial. *Id*. at 1213 ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

Finally, expert testimony must also satisfy the basic relevancy rules set forth in Fed. R. Evid. 401 and 403, as well as any other applicable evidentiary rule. *Daubert*, 509 U.S. at 595 (noting that because "[e]xpert evidence can be both powerful and quite misleading . . . the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." (citations omitted)); *id*. ("Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules [of evidence].").

### B.  Fed. R. Crim. P. 16: Expert Witness Disclosure Requirements

Rule 16(b)(1)(C) governs the content of the required disclosures a defendant must make to use expert testimony at trial: "a written summary" of the expert's anticipated testimony that "describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Fed. R. Crim. P. 16(b)(1)(C). Failure to comply with these disclosure requirements provides a sufficient independent basis for excluding the expert's testimony at trial. *United States v. Day*, 524 F.3d 1361, 1370-71 (D.C. Cir. 2008) (affirming district court's exclusion of expert testimony for this reason).

In this case, the Court set a deadline of July 15, 2022, for expert disclosures by all parties. ECF 179 (Amended Scheduling Order). This deadline was jointly proposed to the Court by the parties in a May 16, 2022, status report. ECF 167.

**ARGUMENT**

The opinion testimony noticed by the defendants fails to satisfy the basic requirements for admissible expert testimony under Fed. R. Evid. 702, 703, 704, 401, and 403 and should therefore be excluded.  In addition, defendant Sutton's disclosure for crash reconstructionist Thomas Langley falls far short of Rule 16(b)(1)(C)'s notice requirements.  Because these deficiencies are so substantial that it is not currently possible to litigate the admissibility of Mr. Langley's opinions, this provides a separate, independent ground for excluding his testimony in its entirety. Alternatively, should the Court not exclude these witnesses' proposed testimony outright, the admissibility of their testimony should be subject to a *Daubert* hearing.

A. **The Defendants' Expert Witness Testimony Is Inadmissible and Should Be Excluded**

a. Sgt. John Brennan (Ret.)

Defendant Sutton has noticed retired MPD Sergeant John Brennan as an "expert in policing."  Sgt. Brennan worked for MPD for 44 years as an officer and 3 years as a civilian, retiring in 2019.  His resume states that most of his career was spent as a "Detective Sergeant of Narcotics and Special Investigation Division and Major Narcotics," which are city-wide policing units with a mission that is similar to the Crime Suppression Team (CST) to which defendant Sutton was assigned at the time of the charged crimes.  While not stated expressly in the defendant's disclosure, Sgt. Brennan's time at MPD appears to be the basis for his asserted expertise in "policing" and "policing procedures."  He has no training of any kind listed on his resume other than the MPD police academy, from which he graduated in 1971.  Def. Sutton Expert Disclosures, at 12-13, attached as Ex. 1.  The defendant's disclosure further states that Sgt. Brennan has "testified as an expert witness on behalf of the government in policing procedures in over a thousand criminal cases in federal and state courts."  Ex. 1, at 1.

4

As an initial matter, the government challenges the proposition that Sgt. Brennan has testified as an expert in policing procedures more than one thousand times. This number is unrealistic given the demand for such testimony and Sgt. Brennan's employment as at MPD for 47 years, without any mention on his resume of outside work during that time. Moreover, the defense disclosure does not identify even one case in which Sgt. Brennan provided such expert testimony, let alone support for that extremely high number of appearances as an expert witness. Based on this information alone, the government challenges the purported breath of Sgt. Brennan's experience and expertise.

Second, many of the opinions to which Sgt. Brennan will testify constitute inadmissible legal opinions that are irrelevant, will mislead the jury concerning the factual issues it must resolve, infringe on the jury's role as the sole fact-finder, and exceed the scope of Sgt. Brennan's claimed expertise. The defendant's disclosure states that Sgt. Brennan will testify that: (1) MPD CST units "use various aggressive policing tactics expressly authorized by decisions of the United States Supreme Court to find and arrest offenders for drug and weapons violations," (2) "Officer Sutton acted in conformity with the highest level of constitutional policing standards in which CST officers are trained," (3) officers "had cause to conduct a *Terry* stop of Hylton-Brown," (4) other conduct by Hylton-Brown gave officers "further cause to stop Hylton-Brown," (5) the manner in which the defendant was "following" Hylton-Brown "is a conventional and lawful tactic used by CST units," (5) MPD officers are "privileged to violate D.C. traffic laws in performance of their duties" and "Officer Sutton's conduct in following Hylton-Brown was consistent with this privilege," (6) the defendant's "conduct in following Hylton-Brown was consistent with" District of Columbia laws concerning emergency driving, and (6) the defendant's driving decisions "did not endanger any member of the public." Ex. 1, at 2-4.

All of these opinions constitute inadmissible, irrelevant testimony about legal conclusions that will mislead and confuse the jury.   As an initial matter, for reasons extensively discussed in the Government's Opposition to Defendant Sutton's Fifth Motion to Compel Disclosure of Requested Discovery (ECF 165), the Government's Omnibus Opposition to Defendants' Motions to Dismiss (ECF 206), at argument on the defendant's motion to dismiss, and in the Court's August 3, 2022 oral ruling denying defendant Sutton's motion to dismiss Count 1 of the Indictment, evidence concerning "constitutional policing standards" and "policing tactics expressly authorized by decisions of the United States Supreme Court" are wholly irrelevant to this case.   As the Court has now ruled, there is no constitutional violation charged here, nor is one required.   As such, any discussion of constitutional standards is irrelevant and will mislead the jury about the legal standards that apply in this case.   And, even if it were relevant (which it is not), such information would be for the Court to provide in its legal instructions, not through an expert witness—and certainly not this particular witness, who has no legal training at all.

The proffered testimony asserting that officers could lawfully stop Hylton-Brown under *Terry v. Ohio*, that certain CST tactics were "lawful," that the defendant's driving decisions were "consistent with" District of Columbia law, that events during the chase gave the officers "further cause" to stop Hylton-Brown, that MPD officers have a "privilege" to violate District traffic laws and that the defendant's conduct "was consistent with this privilege," and that the defendant's driving "did not endanger any member of the public," is inadmissible for similar reasons.   Each of these opinions states a legal conclusion that the defendant's conduct did not violate the law— opinions that are inadmissible both because they will not properly assist the jury under Rule 702, *Burkhart*, 112 F.3d at 1212 (holding expert testimony "that consists of legal conclusions" to be inadmissible because it "cannot properly assist the trier of fact"), and because this particular

witness is not qualified to provide legal opinions. All of these opinions will also improperly invade the province of the jury, which is responsible for ultimately determining whether the defendant's conduct was lawful.

Third, other proffered opinions are beyond the scope of any expertise Sgt. Brennan may have. The defense proposes that Sgt. Brennan testify (1) that the defendant and his fellow CST officers "would have been in dereliction of their duty had they not followed Hylton-Brown to learn whether he was armed or engaged in other unlawful activity," (2) that the defendant's "occasional use of lights and sirens was appropriate to alert citizens to police activity in their neighborhood," (3), that the defendant "did not pursue Hylton-Brown, but rather followed him as Hylton-Brown remained in the area yet alluding [sic] police," (4) that following the collision, "Officer Sutton appropriately began to investigate the circumstances surrounding the event," (5) that "until Officer Sutton was relieved [of handling this matter] his conduct was appropriate, [his] report accurate, and his conduct was fully consistent with his duties at the time," (6) that "Officer Sutton had no obligation to notify either MPD Major Crash or MPD Internal Affairs Division regarding the collision. Based on the declining medical condition of Hylton-Brown at the hospital . . . it was inevitable that Major Crash and IAD would be notified," and (6) that "[n]o criminal case has been brought by [the U.S. Attorney's] office against an MPD officer who did not inflict a fatal injury on a subject." Ex. 1 at 3-4.

Based on the defendant's disclosure, it is unclear how Sgt. Brennan has specialized training or knowledge that would allow him to opine on any of these issues. According to his resume, he has no experience in police administration other than being a line supervisor of a CST-type unit, no experience training officers about their job responsibilities and/or MPD policies, and no experience working in the Internal Affairs Division (IAD), which is the MPD office responsible

for investigating and adjudicating officers' execution of their duties and adherence to MPD policies.  Further, any expertise Sgt. Brennan has concerning "policing" at MPD is not current.  He last worked as a sworn officer in 2015—five years before this incident—and retired his civilian employment with MPD in 2019; his resume indicates no work at all after that time, let alone any work with MPD.  In light of this, it is unclear how any opinion he would provide on these matters would qualify as expert testimony that draws on specialized knowledge or training, and that is also reliably current through the time of the charged conduct in this case, which occurred in October 2020.

In addition, three of these proposed opinions are misleading concerning the applicable legal standards.  Sgt. Brennan's proposed opinion that no criminal case has ever been brought "against an MPD officer who did not inflict a fatal injury on a subject" is both irrelevant and misstates the causation requirement for Second Degree Murder.  The D.C. Court of Appeals expressly rejected the proposition that second degree murder requires proof that the defendant "inflicted injury" on the victim.  *Fleming v. United States*, 224 A.3d 213, 220 (D.C. 2020).  Sgt. Brennan's proposed opinion, by implying that only an officer who has "inflict[ed] a fatal injury on a subject" can be charged with a crime will mislead the jury about the proper legal standard for causation in Count 1.  It is also irrelevant; Sgt. Brennan's anecdotal knowledge of the types of charges brought in other cases will not assist the jury in determining any fact at issue in this case and would only serve the purpose of encouraging the jury to engage in improper nullification.  In addition, Sgt. Brennan's opinion that the defendant "appropriately began to investigate" the crash scene will mislead the jury concerning the legal standard for the obstruction and conspiracy charged in Counts 2 and 3:  the question for the jury to resolve is not whether the defendant complied with MPD policies at the crash scene (which he did not), but whether he handled the crash scene in a

misleading manner designed to forestall other routine investigatory processes within MPD.  It is irrelevant, for these purposes, whether his conduct did (or did not) comport with MPD policies, but expert testimony that the defendant's conduct was "appropriate" under these policies will give the misimpression it could not have been in service of the criminal agreement with which he is charged.  Finally, Sgt. Brennan's proposed opinion concerning the "appropriateness" of the defendant's intermittent use of his emergency equipment also states a misleading legal conclusion. The D.C. Municipal Regulations provide that the privileges given to police officers in emergencies "shall not relieve the driver . . . from the duty to drive with due regard for the safety of all persons," nor do they "protect the driver from the consequences of his reckless disregard for the safety of others."  DCMR 18-2000.3.  Testimony by Sgt. Brennan that the defendant's intermittent use of emergency equipment was "appropriate" will both confuse the jury about the correct legal standard set out in DCMR 18-2000.3, while also providing the jury with an inadmissible legal conclusion that the defendant's conduct complied with the law.[1]  The proposed testimony on these topics should therefore be excluded.

Fourth, several of Sgt. Brennan's proposed opinions improperly seek to introduce evidence of the defendant's subjective knowledge and state of mind concerning an essential element of the charged crimes.  This both contravenes Rule 704(b) and, to the extent it appears to rely on self-

---

[1] The government also challenges this opinion as unreliable under Rule 702(b), (c), and (d).  The basis for this opinion is described only as his review of case materials "and application of his experience in law enforcement," which is inadequate under the disclosure rules.  *See* Fed. R. Crim. P. 16(b)(1)(C) (requiring the disclosure to describe "the bases and reasons" for the expert's opinions).  However, while the limited information provided in the disclosure renders it difficult to present a more detailed reliability challenge to this opinion, the case materials that Sgt. Brennan reviewed contain information that supports a contrary conclusion, including evidence that shows the defendant *turned off* his emergency equipment as he pursued Hylton-Brown through a narrow, blind alleyway onto Kennedy Street.  This calls the reliability of Sgt. Brennan's conclusion about "appropriateness" into question, and it should be excluded under Rule 702(b), (c), and (d).

serving statements by the defendant, is inadmissible hearsay under Fed. R. Evid. 801(c). The defendant proposes that Sgt. Brennan testify (1) that the defendant's draft police report "was an appropriate presentation of what he knew," (2) that "[a]s an experienced CST officer, Officer Sutton knew that his report would not be final until reviewed by his chain of command," (3) that "Officer Sutton had no reason to believe that any of his conduct would be scrutinized by the United States Attorney's Office before he learned Hylton-Brown was unlikely to survive" and (4) that "Officer Sutton had no reason to believe, even after the death of Hylton-Brown, that he would face criminal charges." Ex. 1, at 3-4. Much of this testimony amounts to nothing more than a recitation of self-serving hearsay concerning the defendant's subjective knowledge and is therefore inadmissible hearsay under Rule 801(c). This testimony also seeks to improperly establish the defendant's state of mind at the time of the charged crimes concerning an essential element of the offenses—specifically, whether he acted "knowingly" to obstruct justice, which is an element of Count 3, 18 U.S.C. § 1512(b)(3), and the criminal agreement the government must establish to prove Count 2—a prohibited purpose under Rule 704(b). This testimony should therefore be rejected.

Finally, in connection with each of his opinions, the disclosure indicates that Sgt. Brennan will testify to facts about this incident that are not based in his personal knowledge, his expertise, or the case materials listed as the basis for his opinions. This includes the fact that prior to this incident, Hylton-Brown had been observed arguing "with another [drug] dealer," that officers "feared his return" to the area, that defendant Zabavsky directed defendant Sutton to "go after Hylton-Brown," that "[t]he officers did not pursue Hylton-Brown, but rather followed him, that "[b]ased on the declining medical condition of Hylton-Brown at the hospital . . . it was inevitable that Major Crash and IAD would be notified," that the defendant "was one of the most experienced

and honored CST officers within MPD at the time," and that the defendant "has no reason to believe that any of his conduct would be scrutinized by the United States Attorney's Office before he learned that Hylton-Brown was unlikely to survive. Ex. 1 at 2-4. There is no basis for Sgt. Brennan to testify to any of these facts, as he has no personal knowledge of them, they are not grounded on any expertise he has, and they are not contained in the materials he reviewed. Moreover, any opinion he has of the defendant's standing as "one of the most experience and honored CST officers within MPD" constitutes improper character evidence under Rule 404(a). His testimony in these areas should therefore be precluded.

b.  Bruce-Alan Barnard, J.D., LLM

Defendant Sutton noticed Bruce-Alan Barnard as "an expert in constitutional policing standards and police training." Mr. Barnard is a lawyer who has worked as a law professor, an instructor for the Air Force Judge Advocate Program, and a legal advisor and legal instructor for the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. Ex. 1, at 21-23. He currently works for a private company that provides law enforcement training. *Id*. His curriculum vitae states that he has "trained over 30,000 law enforcement officers." *Id*. at 21.

The defendant seeks to have Mr. Barnard opine about many topics, including: (1) that "MPD's pursuit policy in place at the time was confusing and inconsistent," (2) that defendant Sutton "did not violate the MPD pursuit policy in effect at the time of the incident," (3) that "the Indictment does not describe any conduct by Officer Sutton or any other officer which violates their duty to respect the constitutional rights of Karon Hylton-Brown," (4) that "Officer Sutton did not seize Hylton-Brown or use force against him in any way, as defined by Supreme Court precedent," (5) that "MPD training materials for Officer Sutton are inadequate" and that MPD is not accredited by the Commission on Accreditation for Law Enforcement Agencies, "an

accreditation to which most state and law enforcement agencies aspire," (6) that "Officer Sutton is a decorated veteran and his conduct in this matter conforms to the gold standard for policing: compliance with known constitutional standards established by the courts," (7) that the defendant "complied with his duty to protect the public from potential criminal activities by Hylton-Brown, while at the same time engaging in reasonable law enforcement activities that were not in violation of Hylton-Brown's rights," (8) the information on which officers are trained at FLETC, including whether officers may be subject to criminal or civil liability for their on-duty conduct, (9) that "[c]onspiracy to obstruct justice requires that officers knew there would be a Department of Justice investigation," (10) that "Officer Sutton . . . would not have understood based on the facts contained in the indictment that [he] might suffer consequences other than possible department discipline," (11) that "Officer Sutton could not have engaged in a conspiracy to thwart a federal civil rights investigation because officers do not understand policy violations to lead to criminal liability," (12) that "none of the actions taken by Officer Sutton described in the Indictment as part of the conspiracy to obstruct justice are prohibited by MPD policy," (13) that "Officer Sutton's conduct . . . was consistent with MPD policies, particularly the policy regarding *Terry* stops," (14) that the defendant's conduct "was reasonable, and nothing he did could legitimately be characterized as negligent or grossly negligent as [the defendant] would have understood those terms from his training, and (15) that "Mr. Bernard has never seen such a case prosecuted criminally in his entire career." Ex. 1, at 4-6. The basis for these opinions is described only as his review of case-related materials "and application of his legal and police training experience." *Id.* at 6.

All of Mr. Barnard's opinions are inadmissible. As an initial matter, as explained above and by the Court in its August 3, 2022 oral ruling denying the defendant's motion to dismiss Count

1, questions concerning whether defendant Sutton committed any constitutional violations, acted "reasonably" under constitutional precedents, or violated Hylton-Brown's constitutional rights during this incident are wholly irrelevant to this case. The defendant is not charged with violating the Constitution, nor is any such violation required to prove the pending charges. As such, any testimony about "constitutional standards" or "gold standard" compliance with such standards as "established by the courts," whether there was a "seizure" of Hylton-Brown "as defined by Supreme Court precedent," whether the defendant "complied with his duty to protect the public" from Hylton-Brown while engaging in "reasonable" law enforcement activities that "were not in violation of Hylton-Brown's rights," and whether he acted "reasonably" under these standards is irrelevant under Fed. R. Evid. 401. It is also inadmissible under Fed. R. Evid. 403 as unduly prejudicial because it would confuse the jury about the issues it must resolve in the case, mislead the jury, and waste time.

These opinions concerning "constitutional standards" and whether the defendant violated them also constitute inadmissible legal conclusions. Even if constitutional legal standards were relevant to this case—which they are not—an explanation of the law is the Court's sole province. *Burkhart*, 112 F.3d at 1212 (holding expert testimony "that consists of legal conclusions" to be inadmissible because it "cannot properly assist the trier of fact"). Bald assertions from Mr. Barnard that the defendant's conduct met certain constitutional legal standards "established by the courts" would do exactly what Rule 704 forbids: "merely tell the jury what result to reach" concerning these legal matters. That these opinions constitute improper legal conclusions is a second basis for excluding them.

Mr. Barnard's other opinions suffer from similar defects. For instance, his opinion concerning the required federal nexus for obstruction—that "[c]onspiracy to obstruct justice

requires that officers knew there would be a Department of Justice investigation"—not only is an impermissible legal opinion, but it also misstates the law. The federal nexus requirement for the charged obstruction under 18 U.S.C. § 1512(b)(3) requires proof that the defendant intended to hinder, delay, or prevent the communication of information to federal law enforcement concerning the commission, or possible commission, of a federal crime. *See United States v. Fowler*, 563 U.S. 668 (2011). There is no requirement that "there would be a Department of Justice investigation." This opinion is therefore inadmissible both as an improper legal conclusion, and also because it will mislead the jury, in contravention of Rule 403.

Several of Mr. Barnard's other opinions would also impermissibly mislead the jury and provide improper state-of-mind testimony that is prohibited by Rule 704(b). The defense seeks to elicit three opinions concerning the defendant's state of mind from Mr. Barnard: that the defendant "would not have understood based on the facts contained in the indictment that [he] might suffer consequences other than possible departmental discipline," that he "could not have engaged in a conspiracy to thwart a federal civil rights investigation because officers do not understand policy violations lead to criminal liability," and that "nothing [the defendant] did could legitimately be characterized as negligent or grossly negligent as he would have understood those terms from his training." Each of these opinions violate Rule 704's proscription on expert testimony that "state[s] an opinion about whether the defendant did or did not have a mental state . . . that constitutes an element of the crime charged."

To prove the required mental state for Count 1, the government must establish that the defendant acted with malice aforethought. This can be established through proof that a defendant subjectively knew that his conduct "created an extreme risk of death or serious bodily injury, but engaged in that conduct nonetheless" (ECF 159, at 20), or where the defendant's conduct "is

reckless and wanton, and a gross deviation from a reasonable standard of care, or [of] such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm." *Id*. Here, Mr. Barnard's opinion that "nothing [the defendant] did could legitimately be characterized as negligent or grossly negligent as he would have understood those terms from his training" seeks to opine on the defendant's subjective mental state and whether the defendant was subjectively aware of the serious risks his conduct caused. While it is unclear from the expert disclosure on what possible basis Mr. Barnard could be resting his opinion about the defendant's subjective thoughts, this is improper opinion concerning the defendant's mental state; Mr. Barnard seeks to stand in for the defendant to establish that he did not act with the requisite mental state. This is the exact type of testimony that Rule 704(b) is designed to exclude because it invades upon the province of the jury, and it should be excluded here for that reason.

Mr. Barnard's opinions concerning the defendant's mental state for obstruction and conspiracy are similarly problematic. To prove the obstruction charge in Count 3, the government must establish that the defendant acted "knowingly" to hinder, delay, or prevent communications to federal law enforcement officers, 18 U.S.C. § 1512(b)(3), and the conspiracy charge in Count 2 requires the defendant to have intentionally entered into an agreement to commit this same conduct. 18 U.S.C. § 371. Mr. Barnard's opinion that the defendant "could not have engaged in a conspiracy . . . because officers do not understand policy violations to lead to criminal liability" improperly opines on whether the defendant acted "knowingly," the required mental state for the obstruction charge, and for the conspiracy to engage in that obstruction.[2]  His opinion that the

---

[2] The government also challenges this opinion as without any basis in any apparent expertise—it is unclear from the expert disclosure how Mr. Barnard has any specialized knowledge from which he can opine on what the defendant knows given what "officers" in general know, or even his basis for opining generally on what "officers" know.

defendant "would not have understood based on the facts contained in the indictment" that he could be charged with obstruction suffers from the same defect: it presents an opinion concerning whether the defendant acted knowingly—the required mental state for the charged crime—and it also risks misleading the jury by implying that only conduct charged in the indictment, rather than the full body of proof presented at trial, may be used to assess the defendant's mental state. These opinions should also be rejected.

Mr. Barnard's remaining opinions are irrelevant under Rule 401, inadmissible under Rule 403, fall beyond the scope of Mr. Barnard's expertise, or would not assist the jury in understanding the evidence or determining a fact at issue. Mr. Barnard's opinion that the MPD pursuit policy "was confusing and inconsistent" will not aid the jury in any way; if the policy is introduced into evidence, the jury can read it and draw its own conclusions.[3] His opinion that "none of the actions taken by Officer Sutton described in the indictment as part of the conspiracy to obstruct justice are prohibited by MPD policy" is irrelevant and misleading. The obstructive acts in the indictment are alleged to have been in furtherance of the conspiracy by misleading MPD officials, controlling the MPD response at the scene in a fashion that forestalled the routine investigations that would usually be triggered by this type of incident, and by willfully neglecting to collect evidence. It is immaterial whether any of these actions were, themselves, a violation of MPD policies.[4] This

---

[3] This opinion is also irrelevant, unless the defense seeks to introduce it as a proxy for the defendant's own state of mind concerning what he subjectively understood to be an impermissible operation of an MPD vehicle—thereby negating malice aforethought—in which case the opinion would be improper mental state testimony under Rule 704.

[4] The basis for this opinion, including the MPD policies Mr. Barnard claims were not violated, is not explained in the expert disclosure, and the government also challenges his opinion on this ground. The government has reason to believe that several of the charged obstructive acts do, in fact, violate MPD policies.

opinion is irrelevant and would risk improperly misleading the jury as to the significance of policy violations in this context.

Mr. Barnard's opinion that "MPD training materials for Officer Sutton are inadequate," and that MPD is not accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA), "an accreditation to which most state and law enforcement agencies aspire," and his testimony concerning the training that students receive at FLETC are also irrelevant.   The adequacy of MPD's training materials, and whether or not MPD is CALEA accredited, is immaterial to any fact at issue.  MPD itself is not on trial here, and its training materials are relevant only to show the defendant's subjective state of mind about what he knew he was allowed to do (and not do) in an MPD vehicle.  The "adequacy" of those training materials, or whether MPD could have provided better training if it was CALEA accredited, has no bearing on that question.[5] Further, as there is no evidence that defendant Sutton or any other officer involved in this incident attended the FLETC training Mr. Barnard is referencing, his testimony concerning this training has no bearing at all on any fact the jury must decide in this case.  It should therefore be excluded as irrelevant and unduly prejudicial under Rule 403 for wasting time and misleading and confusing the jury.

Mr. Barnard's opinions that the defendant did not violate the MPD pursuit policy and that his conduct "was consistent with MPD policies, particularly the policy regarding *Terry* stops" fall beyond the scope of his expertise.  The defendant's disclosure does not provide any explanation of why Mr. Barnard believes the defendant's actions complied with these policies other than these conclusory statements, and the only basis provided for his opinions is his review of case materials

---

[5] Moreover, any effort to use such testimony as a proxy for his state of mind would be improper under Rule 704(b)).

"and application of his legal and police training experience." Ex. 1, at 6. Significantly, however, Mr. Barnard's curriculum vitae does not include expertise in police policies, let alone MPD policies: he has never worked as a police officer, never worked as an official at a police department (or at a police department in any capacity at all), never been employed at MPD in any capacity, and his experience as a law enforcement trainer has focused entirely on legal topics, such as "search and seizure law," "electronic surveillance law," "constitutional law" "criminal law." Ex. 1, at 21-23. In light of this, his opinion about the defendant's compliance with MPD policies falls beyond his qualifications, and should be excluded.

Finally, Mr. Barnard's opinion that he "has never seen such a case prosecuted criminally in his entire career" is wholly irrelevant and constitutes an improper attempt to inject jury nullification into this case under the guise of expert opinion. Whatever may or may not have happened in Mr. Barnard's career will provide no assistance to the jury in assessing whether the evidence presented in the courtroom meets the statutory elements of the crimes charged.

In sum, the government respectfully submits that the defendant's proffered testimony from Mr. Barnard is inadmissible in its entirety and should be excluded under Fed. R. Evid. 401, 403, and 702, 703, and 704.

c. Michael A. Wear

Defendant Sutton noticed Michael A. Wear as an expert in "training standards for operation of law enforcement vehicles, vehicular pursuits, identification of criminal behaviors and tactics to reduce crime, contacts and *Terry* stops, and training standards for criminal and civil liabilities of law enforcement officers," as well as the training MPD provides "on departmental policy, standards, practices, and federal and local laws." Ex. 1, at 6-7. The notice states that Mr. Wear

also provided vehicle training to MPD officers between November 2018 and October 2020. *Id*. at 7.

The defendant proffers that Mr. Wear will testify to the following opinions, all of which are inadmissible: (1) that MPD policies "are to be used as guidelines and are distinguishable from the law of constitutional policing," (2) that MPD's policies "do not create legal standards, and violations of departmental policy do not amount to violations of law or legal standards," (3) that the defendant "acted in accordance with his training, departmental policy, and legal standards" when he pursued Hylton-Brown on the night of this incident, (4) that the defendant "had sufficient grounds and was permitted to follow, contact, and conduct a *Terry* stop of Hylton-Brown under the law and departmental policy," (5) that MPD officers "are legally permitted to pursue a suspect for any crime committed in the officer's presence, regardless of whether such a pursuit would be authorized under the MPD's vehicular pursuit policy," (6) "[u]nder the vehicular pursuit policy, activating the lights and sirens on an emergency vehicle does not immediately or automatically constitute a vehicular pursuit," (7) "Officer Sutton's following of Hylton-Brown would not be classified as a police pursuit under the MPD's pursuit policy," (8) "[d]uring the period in which Officer Sutton followed Hylton-Brown, the road conditions were optimal and there was no threat to the safety of the general public, Officer Sutton, or any law enforcement officers," (9) that "Officer Sutton had no reason to believe that he would be subjected to criminal charges for any of the actions he took in the late evening of October 23, 2020," (10) that "Mr. Wear has never seen a case like the one charged in the Indictment in his entire career," and (11) that "MPD officers are not trained or taught that the conduct alleged in the Indictment could subject them to criminal prosecution." Ex. 1, at 7-8.

First, several of these opinions amount to inadmissible legal conclusions that are both irrelevant, *see Burkhart*, 112 F.3d at 1212, and beyond the scope of Mr. Wear's expertise, as he has no legal training. For reasons given above, in numerous prior filings, and the Court's August 3, 2022 oral ruling denying the defendant's motion to dismiss Count 1, "the law of constitutional policing" is not relevant here, and even if it were, it would be the Court's sole province to advise the jury of any constitutional requirements. Similarly, Mr. Wear's proposed opinions that "violations of departmental policy do not amount to violations of law or legal standards," that the defendant had a sufficient legal basis to stop Hylton-Brown under *Terry v. Ohio*, that MPD officers "are legally permitted to pursue a suspect for any crime committed in the officer's presence," and that the defendant "acted in accordance with . . . legal standards" during the pursuit of Hylton-Brown also state inadmissible legal conclusions that invade both the role of the Court and the jury in this case. To the extent that these topics are even relevant here (which the government disputes), it is for the Court alone to instruct the jury, based on legal precedents, of the legal import of an MPD policy violation to the charges in this case, or the proper legal standard established by *Terry v. Ohio*, or what D.C. law permits officers to do if they witness a crime in their presence. And it is for the jury to determine, as part of its assessment of whether the defendant acted with malice aforethought, what legal basis (if any) the defendant may have had to stop Hylton-Brown. The proffered opinions setting out various legal standards and asserting that the defendant acted in compliance them are the exact type of inadmissible legal conclusions the D.C. Circuit has prohibited. *See Burkhart*, 112 F.3d at 1212. They should thus be rejected here.

Second, Mr. Wear's opinion that "activating the lights and sirens on an emergency vehicle does not immediately or automatically constitute a vehicular pursuit" under MPD policy will risk misleading the jury as to the content of the policy. Expert testimony is not necessary to explain

the policy, as the jurors can read it themselves. Regardless, this testimony is misleading, because while the policy requires an officer to activate his lights and sirens throughout the time he is engaged in a vehicular pursuit, it simply does not speak to whether the act of engaging that equipment, on its own, marks the start of a vehicular pursuit. By implying otherwise, this opinion risks misleading the jury about what is actually included in the policy. As such, this opinion should be excluded.

Third, several of Mr. Wear's opinions are irrelevant, provide improper state of mind evidence under Rule 704(b), and would mislead the jury. Mr. Wear's opinion that he "has never seen a case like the one charged in the Indictment in his entire career" is irrelevant to the jury's assessment of whether the evidence presented in this case proves the elements of the charged crimes. His opinion that "MPD officers are not trained or taught that the conduct alleged in the Indictment could subject them to criminal prosecution," and that "Officer Sutton had no reason to believe he would be subjected to criminal charges for any of the actions he took" during this incident seeks to introduce prohibited state-of-mind evidence concerning the required mental state for all three charged crimes, and is therefore inadmissible under Rule 704(b).[6] These opinions should be excluded.

Finally, the government challenges Mr. Wear's remaining opinions—that defendant Sutton's conduct "would not be classified as a police pursuit under the MPD's pursuit policy, and that the defendant's driving decisions created "no threat to the safety of the general public, Officer Sutton, or any law enforcement officer—as unreliable under Rule 702(b), (c), and (d). The basis

---

[6] Based on the sources identified as the basis for Mr. Wear's opinion, it is unclear how Mr. Wear would know what defendant Sutton was thinking on this topic. To the extent his opinion is also based on self-serving hearsay by the defendant, the opinion is also inadmissible under Fed. R. Evid. 801(c).

for these conclusions is not included in the defendant's expert notice, and the case materials Mr. Wear reviewed in forming his opinion contain substantial evidence supporting the opposite conclusion. *See* Fed. R. Crim. P. 16(b)(1)(C) (requiring the disclosure to describe "the bases and reasons" for the expert's opinions). While the limited information provided in the disclosure renders it difficult to present a more detailed challenge to the reliability of these opinions, evidence concerning the length of the chase, the manner in which it started, the path of travel it followed, and numerous of the defendant's driving decisions during the chase undermine the conclusion that this incident did not constitute an unauthorized vehicular pursuit under MPD policy, and support the conclusion that created a risk of harm to the defendant and the officers who were passengers in his car, among others. In light of this, Mr. Wear's opinion should be excluded under Rule 702(b), (c), and (d).

         d. <u>Thomas Langley, Crash Reconstructionist</u>

Defendant Sutton noticed Thomas Langley as an expert in accident reconstruction. The notice claims that he has testified as an expert in more than 125 cases and 400 depositions. However, the notice provides no summary whatsoever of his opinions for this case. Instead, the notice states that "Mr. Langley is still evaluating Ofc. Sutton's case," and attributes the lack of any opinions to the fact that Mr. Langley "was not afforded an opportunity to examine" the vehicles involved in this incident until June 28 and 29, 2022. Instead of providing Mr. Langley's opinions, the notice lists topics on which he may later opine.[7]

---

[7] The expert notice also states that the defense has asked the government for additional discovery "for missing information which should be in the custody of the government" to provide to their expert. While defense counsel did tell the government on July 1, 2022 that a discovery request for their expert would be forthcoming, no such request was sent until more than one month later, on August 4, 2022.

This notice is grossly deficient under Rule 16(b)(1)(C), and Mr. Langley's testimony should be excluded on that reason alone. The defendant consented to the July 15, 2022, expert disclosure deadline while knowing that vehicle inspections would occur during the last week of June 2022: the government notified the defense on April 26, 2022, about the timing of the vehicle inspections, *see* Ex. 2 (email),[8] and several weeks later, on May 16, 2022, the defense consented to the July 15, 2022 expert disclosure date and jointly proposed it to the Court for the pretrial schedule. ECF 167 (joint status report). These deadlines, of course, were in service of an October 17, 2022, trial date that the defendant had advocated for at the May 2, 2022 status hearing before the Court. *See* ECF 163 (status report discussing the defendant's proposed October 17, 2022 trial date); ECF 164 (joint status report jointly proposing that the Court adopt a October 17, 2022 trial date). Notably, the defendant has not asked for any modification of the pretrial schedule for expert disclosures at any point.

Given that the July 15, 2022, disclosure deadline was proposed by the defense in a joint filing, at a time when the defendant was on notice that Mr. Langley could not inspect the vehicles until the last week of June 2022, there is no excuse for the deficient expert notice concerning Mr. Langley's opinions. In ignoring the basic requirements of Rule 16(b)(1)(C), the notice fully undermines the stated purpose of these disclosure requirements: to "minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross examination." Fed. R. Crim. P. 16, Advisory Committee Notes (1993); *see Day*, 524 F.3d at 1372 (discussing this rule, and excluding criminal defendant's expert due to inadequate Rule 16

---

[8] The fact that the vehicle inspections would take place during the last week of June was also memorialized in a status report to the Court that was filed the same day. ECF 160.

disclosures). Mr. Langley's expert notice renders the government entirely unable to properly challenge his opinions in pre-trial litigation or prepare for any pertinent cross-examination on September 1, 2022, the date the Court has set aside for a potential *Daubert* hearing, let alone at trial. Mr. Langley's opinion should be excluded on the ground of this wholly deficient notice alone. *See Day*, 524 F.3d at 1370-71.

In addition to this, several of the proposed "topics" about which Mr. Langley has been noticed to opine rest beyond the scope his expertise. Mr. Langley's resume identifies him to be a crash reconstructionist, with training in that field and experience at the Cobb County (Georgia) Police Department. However, several of the topics listed as likely areas in which Mr. Langley will eventually opine require expertise beyond his particular training and experience. Specifically, the disclosure states that Mr. Langley "is expected to provide opinion testimony" on his "assessment of the Major Crash Unit investigation," and "the speed of the Scion and the moped at impact, and the resultant injuries to Hylton-Brown." Ex. 1, at 9. Mr. Langley has no experience at all in medicine or biomechanics, and therefore is not qualified to talk about "the resultant injuries to Hylton-Brown" that resulted from the collision. *See* Ex. 1, at 31-35 (Langley resume). And with regard to his assessment of the MCU investigation, nothing in Mr. Langley's resume indicates he is familiar with that unit's specific operating procedures within MPD, or that he has a background in police administration of any kind. His "assessment" of the MCU investigation would therefore exceed his expertise as a crash reconstructionist for a different police agency. It would also be irrelevant, as neither MCU nor MPD are on trial, and the quality of MCU's investigation into this incident—which only started after the charged crimes had concluded—is irrelevant. Mr. Langley should be precluded from testifying to these topics at all, even without knowing at this time what those opinions would be.

Finally, two of the other topics about which Mr. Langley "is expected" to opine raise baseline reliability concerns based on the available evidence in this case: "the speed and direction of all vehicles and the moped" at the time of the collision, and "information stored by different vehicles including their GPS trackers and airbag modules."  The speed at which the car that struck Hylton-Brown was traveling is irrelevant to the jury's assessment of this case.  Regardless, based on information provided to the government by its retained expert in accident reconstruction, there is inadequate available evidence to calculate the speed of the car that struck Hylton-Brown.  It is therefore unclear what methodology Mr. Langley would use to make this calculation, and whether it would be of a reliable scientific method, as required for such testimony.  Similarly, there is minimal information available from the vehicles' GPS trackers (if they had them) or airbag modules.  The absence of this information raises similar concerns about the reliability of any opinions by Mr. Langley on these topics, whatever they may be.[9]  His opinion in these areas should also be excluded.[10]

### e.  James K. Dahlquist, Crash Reconstruction Police Procedure Expert

Defendant Zabavsky noticed James K. Dahlquist as a crash reconstruction and police procedure expert.  Mr. Dahlquist is a certified Georgia Traffic Accident Reconstruction Specialist who worked for the Cobb County (Georgia) Police Department for 26 years, retiring in 2021.  Ex. 3, at 12 (Dahlquist resume).   He served 18 of those years in his department's crash reconstruction

---

[9] The absence of information provided about Mr. Langley's opinions in the disclosure further amplifies these problems, and the difficulty in addressing them in a timely fashion.  This provides another ground for excluding any testimony by Mr. Langley on these topics under Rule 16(b)(1)(C).

[10] The government respectfully submits that, while the defendant's disclosures for the other expert witnesses is more robust than for Mr. Langley, those notices still stuffer from many of the same deficiencies, in that the summaries provided of the witnesses' testimony consists of conclusory statements for which the witness's basis and reasoning is not clear.  This provides an additional ground for excluding those witnesses under Rule 16(b)(1)(C).

unit.  *Id*.  Although he was a lead investigator on cases with his department, his resume lists no work supervising that unit, no work or certifications as a trainer in the area of crash reconstruction, and no work with other police departments, including MPD.  *Id*. at 12-14.

While Mr. Dahlquist's experience appears to qualify him as a crash reconstructionist, that is not the purpose for which the defendant seeks to call him as a witness; rather, the notice appears to anticipate that Mr. Dahlquist will instead testify as a "police procedures expert."  Nothing in his resume indicates he is qualified to serve as an expert on that topic.  Because such opinions are beyond the scope of his expertise, irrelevant, will be misleading and confusing to the jury, and will not assist the jury in determining the facts at issue in this case, these opinions should be rejected.

First, the defendant proposes that Mr. Dahlquist testify about the content of MPD policies concerning officers' obligations to notify MPD's Major Crash Section (MCS) about serious traffic collisions involving death or a serious injury.  Mr. Dahlquist will opine that MPD's policies concerning these notifications "rely on a 'member's' subjective opinion to determine what constitutes a serious personal injury or belief that a victim may die," that "[u]nless there is a known fatality, the policies make a MCS request discretionary," and that "during [Mr. Dalhquist's] career, he was notified of multiple crashes which resulted in serious injury or death well after the collision was investigated by a patrol officer and the scene completely cleared . . . due to the on-scene officers believing that the known injuries were not life-threatening."  Ex 3, at 5.

These opinions are inadmissible because they are irrelevant, beyond the scope of Mr. Dahlquist's expertise, and risk misleading the jury.  Mr. Dahlquist has no expertise or experience at all concerning MPD policies, including the policy that describes the required notifications to MCS by officers at the scene of a crash; accordingly, his opinions about that policy are inadmissible.  Moreover, it is not disputed that this policy relies on individual officers to make a

subjective assessment of a crash victim's injuries—that fact is clear from the language of the policy itself—and therefore no expert testimony is needed in this area.   Further, Mr. Dahlquist's characterization of the policy as a "discretionary" contact to MCS for non-fatal crashes misstates the policy; if an officer sees serious injuries that could result in death, then the officer is required to request MCS involvement.   Testimony that such contact is "discretionary" would therefore mislead the jury.   Finally, it is entirely irrelevant that in other cases during Mr. Dalhquist's career, he is familiar with instances where an officer misjudged the seriousness of a crash victim's injuries. Such testimony will not assist the jury—which will be presented with video footage, photographs, and eyewitness testimony from the scene—with assessing the evidence presented in court concerning the obviousness of Hylton-Brown's serious injuries to those who observed him, including both defendants.   These opinions should therefore be rejected.

The defendant also proposes additional opinions from Mr. Dahlquist that exceed his expertise as a crash reconstructionist, including his opinion "that although unconscious, the evidence provided to [Mr. Dahlquist] indicated Mr. Hylton-Brown's visible injuries were minimal. Human biological material at the scene appears to be vomit and not blood.   It did not appear that officers or fire department responders were engaged in cardiopulmonary resuscitation," and that "[u]nder these circumstances, Lieutenant Zabavsky and other MPD members at the scene may not have understood the seriousness of Mr. Hylton-Brown's injuries."   Ex 3 at 4.   Mr. Dahlquist has no medical training that would allow him to provide anything more than lay opinion as to whether the victim's "visible injuries were minimal" or as to whether the paramedics were giving Hylton-Brown cardiopulmonary resuscitation.   This testimony is therefore not properly presented as expert testimony through Mr. Dahlquist (or as lay opinion testimony, either, since he has no first-hand knowledge of what happened at the scene).   At the same time, no expert testimony is required for

jurors to determine whether color photographs and videos show vomit or blood; the average juror will be familiar with what both of those substances look like, and how to distinguish between them. For these same reasons, Mr. Dalhquist's summary opinion that "[u]nder these circumstances" the defendants "may not have understood the seriousness" of the victim's injuries is inadmissible as speculative, beyond the scope of Mr. Dalhquist's expertise, and untethered to any reliable expert methodology, as this conclusion appears to be based only upon Mr. Dalhquist's other inadmissible lay opinions concerning the victim's injuries. This, too, should be excluded.

The defendant also proposes eliciting testimony from Mr. Dahlquist that MCS had adequate evidence available to it to conduct a crash investigation, as well as his opinions concerning perceived shortcomings with the MCS investigation. These opinions include: (1) that the delay in notifying MCS of this incident "did not hinder or obstruct the investigation," (2) that "even if the evidence [from the crash site] had been moved, scrape marks on the roadway indicate where the collision occurred and the moped's final rest," (3) that "although the [vehicle that struck Hylton-Brown] was driven home, it was not altered and was available for inspection within hours of the collision," (4) that investigators were still "able to determine how the collision occurred," (5) that due to the amount of evidence available to [MCS], a satisfactory investigation and report could be completed," (6) that because MCS had access to the BWC of defendant Sutton's front-seat passenger, MCS had "the best evidence available" of the crash that was "sufficient to complete a satisfactory investigation," (7) that the MCS report for this incident "is accurate but only slightly more thorough than a satisfactory investigation" because "[e]vidence and documentation that Mr. Dalhquist expected to see in the MCS report are missing," (8) that "due to the amount of evidence available to [the MCS detective], a satisfactory investigation and report could be completed," and

(9) that "[the MCS detective's] decision not to conduct a more thorough investigation suggests he was satisfied with the evidence available to him despite the delayed request."  Ex. 3 at 5-7.

All of these opinions are irrelevant and risk misleading the jury, for three reasons.  First, Mr. Dalhquist's opinion that the defendant "did not hinder or obstruct the investigation" is an inadmissible legal conclusion that is irrelevant and will not properly assist the jury.  Second, the obstruction and conspiracy charges in Counts 2 and 3 do not require proof that the MCS investigation was so damaged by the defendants that MCS could not complete it.  Rather, to prove these crimes as charged in this indictment, the government need only establish that the defendants knowingly engaged in misleading conduct *with the intent* to hinder, delay, or prevent MCS from doing its job, for purposes of forestalling the transmission of any information about the crash to federal authorities.  Because of this, Mr. Dalhquist's testimony about all the ways in which  MCS could still conduct a crash investigation *despite* the defendants' obstructive conduct at the scene is both irrelevant and will mislead the jury as to the question it must decide to properly assess the evidence for Counts 2 and 3.  Third, Mr. Dalhquist's opinions concerning the quality of the MCS investigation are irrelevant to any question the jury must decide here; MCS is not on trial, and criticism of how it carried out its investigation after the charged crimes were complete is simply not relevant.

Mr. Dalhquist's remaining opinions also are inadmissible.  Mr. Dalhquist's testimony that "all officers in his department were expected to investigate a crash they witnessed regardless of their assignment" and that "[o]ften times this helped improve relations between officers assigned to specialized units and patrol officers" is completely irrelevant to the facts at issue in this case and will not assist the jury in any way.  His opinion that MPD policy "does not state the [crash] investigation cannot be completed by a member of the crime suppression team" is self-evident in

the text of the policy, and therefore is not the product of any "specialized knowledge" that "will help the trier of fact to understand the evidence," as required by Rule 702. His opinion that "Lieutenant Zabavsky's actions at the scene of the traffic collision were within policy and were not unique" is beyond the scope of his expertise as a crash reconstructionist, rather than an expert in policing practices or MPD policies. And his proffered opinion that both defendants "were aware that their body cameras, as well as those of multiple officers at the scene, had recorded evidence sufficient to document the incident and scene" improperly seeks to introduce subjective state of mind evidence concerning required elements of Counts 2 and 3—that the defendants acted "knowingly," for the purpose of engaging in misleading conduct, in their management of the crash scene. This evidence contravenes Rule 704(b) and should also be excluded.

**B.** **In the Alternative, the Court Should Order a *Daubert* Hearing to Determine Whether These Experts' Testimony Is Admissible**

The government respectfully submits that the expert witnesses disclosed by the defense would present inadmissible testimony that should be excluded in its entirety, and no further examination of these experts is necessary. However, should this Court not exclude their testimony outright, the government requests that it hold a *Daubert* hearing to determine whether their testimony is admissible under Rule 702. *See Burkhart*, 112 F.3d at 1211 ("In interpreting [Rule 702], we apply a two-part test for determining the admissibility of expert testimony: the witness (1) must be qualified, and (2) must be capable of assisting the trier of fact."). As discussed above, in addition to advancing inadmissible testimony, several of the proffered opinions in the defendants' disclosure appear to stretch beyond the witness's demonstrated area of expertise or are not supported by sufficient facts, data, or reliable methodology, as required by Rule 702(b). Additionally, the defendant's assertion that Sgt. Brennan has "testified as an expert witness on behalf of the government in policing procedures in over a thousand criminal cases," while his

resume is not clear as to how this was possible, warrant further exploration of his qualifications if the Court does not otherwise exclude his opinions as inadmissible.

## CONCLUSION

The defendants seek to elicit inadmissible opinion testimony from five noticed expert witnesses.  Based on the summaries of this evidence in the defendants' expert disclosures, the Court should prohibit the introduction of these inadmissible opinions outright, under Fed. R. Evid. 702, 703, 704, 401, 403, and 801(c) and Fed. R. Crim. P. 16(b)(1)(C).  Alternatively, the Court should subject these witnesses to a *Daubert* hearing to further assess the admissibility of this testimony.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    */s/ Risa Berkower*
RISA BERKOWER
NY Bar No. 4536538
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6782
Email: risa.berkower@usdoj.gov