## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | Case No: 1:21-cr-598-PLF |
| v. | : | |
| | : | Judge Paul L. Friedman |
| TERENCE SUTTON, et al. | : | |
| | : | |
| Defendants. | : | |

### ANDREW ZABAVSKY'S MEMORANDUM IN SUPPORT OF SENTENCING

The defendant, Andrew Zabavsky, by and through his counsel, Christopher Zampogna on behalf of Zampogna, P.C., respectfully represents that he has reviewed the Pre-Sentence Report (PSR) and, in accordance with 18 U.S.C. § 3553(a) and the remedial scheme set forth in *United States v. Booker*, 125 S.Ct. 738 (2005) and *United States v. Hughes*, 401 F.3d 540 (4th Cir. 2005), presents this memorandum and position of Zabavsky with respect to sentencing factors to aid the Court in determining the appropriate sentence. The Court should sentence Zabavsky to four years of probation.

I.  ZABAVSKY'S BACKGROUND

Andrew Zabavsky was a law-abiding citizen with no criminal history before the instant incident. He was hardworking, deeply involved in the betterment of his community, and a caring member of his family. He served on the Metropolitan Police Department for 18 years, first as an officer and later as a lieutenant of the

1

Fourth District's Crime Suppression Team.  Zabavsky's father, Anatoly Zabavsky, was a long time general manager, vice-president, and eventual part owner of the Victor Kamkin Bookstore in Rockville, Maryland, where he oversaw the largest Russian-language bookstore outside of Moscow.  Zabavsky's mother, Desanka Zabavsky, also worked at the Victor Kamkin bookstore, eventually becoming vice-president overseeing periodicals.  Andrew Zabavsky followed in his parent's footsteps, even being a minority owner of the bookstore in the late 90s.

Zabavsky's life, from his youth through his career in the Metropolitan Police Department, focused on community and helping those around him.  During his tenure at the MPD, Zabavsky earned numerous accolades celebrating his role in the community, including the 2005 ANC 1C Neighborhood Officer of the Year presented to Andrew "Smiley" Zabavsky.  Zabavsky's professionalism and dedication to serving the community was confirmed later, with promotions to Sergeant and Lieutenant as well as recognition as Sergeant of the Year in 2016.

Zabavsky known at his job for reliability and professionalism.  At times, his commanding officers would even request that he assume their responsibilities and supervise the entire Fourth District.  As a result, throughout his life, Zabavsky continually acted in the interests of growing and bettering the community around him, both in Russian culture and in the District of Columbia.

II.    October 23, 2020

On October 23, 2020, Andrew Zabavsky was working for the Washington DC
Metropolitan Police Department (MPD) as a Lieutenant overseeing the 4th District
Crime Suppression Team (CST).  On that shift, he oversaw two vehicles, one driven
by Officer Terence Sutton, the other by Officer Josh Wilson.  Zabavsky, who
preferred to supervise from the field, was following the vehicle driven by Sutton,
himself a ten year veteran of the MPD who had been awarded multiple awards
demonstrating his aptitude as an officer.

Towards the end of their shift, Zabavsky and Sutton received word from
Officer Pitt that she had been earlier harassed by Karon Hylton-Brown, a person
listed in the MPD database as a member of the Kennedy Street Crew, a violent
street gang operating in the Brightwood Park neighborhood of Washington, D.C..
Shortly thereafter, Lt Zabavsky and Officer Sutton observed Hylton-Brown
operating a Revel electric scooter (similar to a moped) nearby.  Hylton-Brown was
driving erratically on the sidewalk without a helmet on as required by law.

Officer Sutton, supported by Lt. Zabavsky, then attempted to effectuate a
traffic stop on Mr. Hylton-Brown, who promptly fled on the moped.  Lt. Zabavsky
and Officer Sutton's vehicle followed Mr. Hylton-Brown, with Lt. Zabavsky's
marked police car at one point for a brief moment Zabavsky's vehicle took the lead
in an attempt to effectuate a proper traffic stop on Mr. Hylton-Brown.  At 7th St,
NW and Ingraham Street, Mr. Hylton-Brown conducted a U-turn.  Officer Sutton,

following Mr. Hylton-Brown, conducted a U-turn.  Lt. Zabavsky disengaged from what was becoming a pursuit.[1]

Lt. Zabavsky, obeying all the laws of traffic, then turned left onto 5th Street, NW and then left onto Kennedy Street, NW.  Occasionally Officer Sutton would provide updates on his location.  The final message over the radio from Officer Sutton was "Eighth and Jefferson."  Approximately 30 seconds later Lt. Zabavsky heard the sound of a collision behind him on Kennedy Street, NW.  Lt. Zabavsky then engaged in a 3-point turn to approach the scene of the collision, returning to a section of road he had previously passed.   He did not participate in the following of the vehicle nor did he order the following of Hilton-Brown's moped.  Furthermore, Lt. Zabavsky did not engage in a "U-turn" prior to the collision.

Lt. Zabavsky arrived at the scene after CST officers had already approached Mr. Hylton-Brown and after Officer Toth had already signaled the collision on the main MPD radio.  Zabavsky engaged in a hands-off management style trusting his most experienced officer, Sutton, to handle the situation.  Officer Sutton, a decorated ten-year veteran of the MPD, informed Lt. Zabavsky that he would write the police report on the incident.  Lt. Zabavsky, unaware of the circumstances of the collision, trusted Officer Sutton to follow MPD General Orders.

As more officers arrived at the scene, Lt. Zabavsky trusted that those responsible for investigating the circumstances of the collision, primarily Officer

---

[1] Captain Franklin Porter, the watch commander on October 23, 2020, made the determination that Sutton had engaged in a pursuit of Mr. Hylton-Brown.  Captain Porter testified that the attempted traffic stop became a pursuit after Officer Sutton drove the wrong way down a one way street.  Trial Transcript, Nov. 17, 2022 AM. At 79:14-17.  Zabavsky had disengaged at that point.

Sutton, would engage in the proper investigative procedures.  At one point, Lt. Zabavsky inquired and ensured that Officer Sutton had turned on his Body-Worn Camera.  When Officer Sutton asked whether he should turn it off, Lt. Zabavsky stated that it should remain activated.

Lt. Zabavsky then determined that the scene was under control and that he and the CST vehicle should return to the station.  Lt. Zabavsky requested that Officer Arnone remain on the scene and ensure that the tow crane arrived to retrieve Mr. Hylton-Brown's vehicle.  This action was intended to leave Officer Arnone in charge of the scene following Zabavsky's departure.

Upon returning to the station, Lt. Zabavsky and Officer Sutton reported to Captain Franklin Porter, the watch commander.  Lt. Zabavsky informed Captain Porter that he had been involved in the initial traffic stop with Mr. Hylton-Brown. Lt. Zabavsky further informed Captain Porter that MPD had an officer at the hospital to provide updates on Mr. Hylton-Brown's condition.

Lt. Zabavsky then began to review the BWC footage from the incident while Officer Sutton and the rest of the Crime Suppression Team (CST) worked on the draft police report from the incident.  At no time during this period did any member of the CST, who were aware of Officer Sutton's role in the pursuit, inform Lt. Zabavsky of Officer Sutton's involvement and that he should not write the report. While Lt. Zabavsky was in his office, Officer Sutton and Officer Novick, another member of the CST team, received updates on Mr. Hylton-Brown's condition from Officer Davis at the hospital.  Officer Davis had three conversations with Officers

Sutton and Novick, and it was only in the final one that Lt. Zabavsky personally talked with Officer Davis and learned that Mr. Hylton-Brown would not survive.

Immediately upon learning of Mr. Hylton-Brown's medical condition, Lt. Zabavsky called the Major Crash Section (MCS) of the MPD. The general orders of the MPD require that MCS be alerted whenever a person in a vehicular decision will die. Furthermore, Lt. Zabavsky promptly alerted Captain Porter of Mr. Hylton-Brown's condition and that he was, at that moment, on the phone with MCS.

Tragically, Mr. Hylton-Brown succumbed to his injuries.

III.    Sentencing Guidelines Considerations

While the Court must consider the sentencing guidelines ranges, the ranges provided in the sentencing guidelines are not mandatory and the Court can tailor a sentence in light of other statutory concerns. *U.S. v. Booker*, 543 U.S. 220, 756-57 (2005). In fact, the Court "may not presume that the Guidelines range is reasonable." *Gall v. U.S.*, 552 U.S. 38, 50, 128 S.Ct. 586 (2007). Rather, the Sentencing Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. U.S.*, 552 U.S. 85, 90, 128 S.Ct. 558 (2007). Moreover, the uniqueness of this case, as all sides agree of the one of a kind, makes it impossible to follow the guidelines and illegal.

The Sixth Amendment of the United States requires that juries, not judges, find the facts relevant to sentencing. *Booker*, 543 U.S., at 746, 756. For purposes of determining the maximum sentencing, a judge may impose a sentence "*solely on the*

6

*basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis in original).

### A.  Elements of the Charges

In this matter, the jury found that Lt. Zabavsky committed Conspiracy under 18 U.S.C. § 371 and Obstruction of Justice under 18 U.S.C. § 1512(b)(3).  For the obstruction charge, the jury was instructed to find guilty if the government proved the following beyond a reasonable doubt.

1. The defendant engaged in misleading conduct, or attempted to do so, toward another person – in this case, other officials of the Metropolitan Police Department; and

2. The defendant acted knowingly; and

3. The defendant acted with the specific intent to hinder, delay or prevent the communication of information; and

4. It was reasonably likely that the information would have been communicated to a law enforcement officer of the United States; and

5. That the information related to the commission or the possible commission of a federal offense.

Final jury instructions, at 30.  Furthermore, the jury was specifically instructed that "Because the statute explicitly refers to the possible commission of a federal offense, the government need not prove that any person was actually guilty of any underlying federal offense."  *Id.*, at 31.

Furthermore, when finding Officer Sutton guilty of second degree murder, the jury found beyond a reasonable doubt that:

1. Terence Sutton caused the death of Karon Hylton-Brown; and

2. At the time he did so, Mr. Sutton acted in conscious disregard of an extreme risk of death or serious bodily injury to Karon Hylton-Brown.

Final jury instructions, at 27.

> B. The Court Must Determine the Proper Sentencing Base Offense Level.

In their presentence investigation report, the Probation Office incorrectly found that the base offense level for Zabavsky's sentencing should be 30. Instead, the base offense level should be 14.

For a conviction of obstruction of justice, the Court must first look to §2J1.2. U.S.S.G. §2J1.1. This guideline states that the base offense level for obstruction of justice is 14. U.S.S.G. §2J1.1(a)(1). Alternatively, if the offense involved obstructing the investigation or prosecution of a criminal offense, apply the Accessory After the Fact provision of §2X3.1 in respect to that offense if the resulting offense level is greater than 14. U.S.S.G. §2J1.1(c).

Accessory After the Fact, as described in §2X3.1, states that the base offense is 6 levels lower than the offense level for the underlying offense, except that it cannot he lower than 4 or greater than 30. U.S.S.G. §2X3.1(a).

The Probation Office then incorrectly stated that the correct underlying offense was an offense involving individual rights, governed by §2H1.1.  §2X3.1 n.1 states that the "underlying offense" is the "offense as top which the defendant is convicted of being an accessory."  U.S.S.G. §2X3.1 n.1.  However, to find that Zabavsky was guilty of obstruction of justice, the jury did not have to find the existence of any underlying federal crime.  As the Court described:

> As an initial matter, defendants are not charged with committing a civil rights violation.  They are charged with engaging in misleading conduct with the intent to hinder communications to authorities who <u>might</u> investigate the matter as a civil rights violation… The government need only charge and prove possible existence of a federal crime.

Dkt. 318, at 8.  Similarly, the jury was instructed that "[b]ecause the statute explicitly refers to the possible commission of a federal offense, the government need not prove that any person was actually guilty of any underlying federal offense."  Final Jury Instructions, at 31.  As such, the Court cannot incorporate the underlying offense as being a civil rights violation governed under §2H1.1(a)(1).

Instead, the underlying offense that Zabavsky was convicted of being an accessory should be involuntary manslaughter.  The Court in *Booker* found that Congress's goal when establishing sentencing regulation "depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."  *Booker*, 543 U.S. at 250.  The real, relevant conduct by Zabavsky and Sutton, under the federal definitions of crimes for sentencing purposes, means that the underlying offense would be involuntary manslaughter.

Involuntary manslaughter, as defined in federal statute, is the "unlawful killing of a human being without malice… in the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 U.S.C. § 1112(a).

When examining Zabavsky's real conduct, the Court must find that the underlying crime of his obstructive conduct was involuntary manslaughter as defined in federal law. Regardless of the crime Sutton was convicted of, Zabavsky must be sentenced only on his conduct. The jury was instructed that involuntary manslaughter was based on the person's knowledge of the risk associated with their conduct. Final Jury Instructions, at 27.

Zabavsky was not aware of the risk, nor could a jury find by a preponderance of the evidence that he was aware of those risks following his disengagement. As such, Zabavsky's underlying offense must be involuntary manslaughter. Zabavsky's conduct was not performed in the knowledge of the facts underlying a murder. As established by a preponderance of the evidence at trial, Zabavsky knew that an oncoming vehicle had struck Mr. Hylton-Brown, but did not know about some of the circumstances of the pursuit such as Mr. Sutton's driving the wrong way down a one way road or how close Mr. Sutton was to Mr. Hylton in the alleyway.

The government declined to charge Lt. Zabavsky with accessory to murder because he did not possess the requisite knowledge and *mens rea* and was not responsible. If Zabavsky were removed from the pursuit, the result would be the

same.  For that reason, the Court should use involuntary manslaughter as the

underlying crime.

Sentencing for involuntary manslaughter is governed under §2A1.4.  U.S.S.G.

§2A1.4.  The base level for Zabavsky's underlying conduct must be criminal

negligence, defined as "conduct that involves a gross deviation from the standard of

care that a reasonable person would exercise under the circumstances, but which is

not reckless."  U.S.S.G. §2A1.4, n.1.  As such, the base offense level must be 12.

U.S.S.G. §2A1.4.

That base offense level of 12, with 6 subtracted from it due to Accessory After

the Fact, means that the §2J1.2 Obstruction underlying conduct level would by 6.

Pursuant to §2J1.2(c), the total base level for Zabavsky's criminal conviction would

be 14.

### C.  The Court Must Determine the Proper Adjustments to Zabavsky's Sentencing Offense Level

The Probation Office, at the request of the government, incorrectly applied an

obstruction of justice adjustment under §3C1,1.  U.S.S.G. §3C1.1.  However, §3C1.1

n.5 provides that "making false statements, not under oath, to law enforcement

officers" does not qualify for this adjustment unless it "*significantly* obstructed or

impeded the official investigation or prosecution of the instant offense."  U.S.S.G.

§3C1.1 n.3, 5 (emphasis added).  Furthermore, "[i]n applying this provision in

respect to alleged false testimony or statements by the defendant, the court should

be cognizant that inaccurate testimony or statements sometimes may result from

confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. §3C1.1 n.2.

The claimed obstructive conduct occurred in an informal interview between Special Agent Ricardi and Lt. Zabavsky inside Zabavsky's personal residence on November 10, 2020. At no point throughout the pretrial, trial, posttrial, or in their objections to the Probation Office's Revised Presentence Report did the Government claim that Zabavsky's actions in this interview significantly obstructed their investigation or prosecution into this matter. Rather, the U.S. Attorney's Office for D.C. was informed that Zabavssky was added to the IAD investigation on October 27, 2020. Zabavsky Ex. 197. Testimony at trial further supported his statements, including that Mr. Hylton-Brown smelled of alcohol, and that some officers did not consider the incident a chase throughout its duration.

Even if any statements made in that discussion were incorrect or misleading (which they were not), they do not qualify for an obstruction of justice enhancement under §3C1.1 as they did not significantly obstruct the investigation, as two weeks prior Agent Della Camera, an MPD Internal Affairs Division (IAD) official who worked closely with the USAO, had informed USAO that Zabavsky was a subject of their investigation. Therefore, the Court must not include this 2 point adjustment.

The Court must further grant Zabavsky a 4 point adjustment for his minimal role in the criminal activity. Zabavsky, in his role as Lieutenant, trusted Officer Sutton, a decorated ten year veteran of the MPD. Zabavsky, who was driving away

at the time, did not know the full scope of the collision nor the instances directly preceding it. Furthermore, information related to Mr. Hylton-Brown's condition was relayed by Officer Davis to Officers Sutton and Novick, with Zabavsky only intermittently hearing the conversations from the adjoining office.  Officer Sutton, who volunteered to write the police report,[2] stated that he had the information he needed from the striking vehicle and it occupants before ordering that the vehicle could leave.

The evidence at trial undisputably showed that, when he learned of Hylton-Brown's worsening condition and that he would die, Zabavsky was shocked and asked if Officer Davis was joking.  Upon confirmation, Zabavsky immediately informed MCS and his superior, Captain Porter.  Throughout this time period, Sutton, working with the other officers in CST (with the exception of Zabavsky) wrote the draft police report.

Zabavsky stood to benefit nothing from engaging in any obstruction, a factor which §3B1.2 states should be considered when evaluating the minimal role that a person has in any criminal activity.  Therefore, a 4 point departure is warranted for Zabavsky.

Zabavsky further is entitled to a deduction in the offense level for acceptance of responsibility.  §3E1.1 states that "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  U.S.S.G. §3E1.1(a).  Notably, "the fact that a defendant's challenge [to relevant

---

[2] It is not a violation of the MPD General Orders for a senior officer to write the report.

conduct] is unsuccessful does not necessarily establish that it was either a false denial or frivolous." U.S.S.G. §3E1.1 n.1(A). Furthermore, Zabavsky voluntarily withdrew from the criminal conduct by affirmatively alerting MCS and Captain Porter about Mr. Hylton-Brown's condition. U.S.S.G. §3E1.1 n.1(B). For those reasons, Zabavsky should be entitled to a further 2 point reduction for acceptance of responsibility.

After taking into consideration Zabavsky's proper base offense level of 14, and the appropriate adjustments to that sentencing offense level (as discussed above, including 2 points for being a first time offender), Zabavsky's final offense level should be 6. The term of imprisonment for an offense level of 6 is 0-6 months in jail. Furthermore, at an offense level of 6 Zabavsky is eligible for probation, should the Court determine any sentence is warranted.

IV.     Other Sentencing Considerations.

While the Court should take into consideration the sentencing guidelines, by statute the Court is required to consider the factors identified for sentencing in 18 U.S.C. § 3553(a). The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the settlement imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

14

       (C) to protect the public from further crimes by the defendant; and

       (D) to provide the defendant with needed educational or vocational

           training, medical care, or other correctional treatment in the most

           effective manner."

18 U.S.C. § 3553(a)(2).  In "determining the particular sentence to be imposed," the

Court must consider these purposes, the nature and circumstances of the offense

and the history and characteristics of the defendant, the need to avoid unwarranted

disparities, and the need to provide restitution to any victims of the offense.  18

U.S.C. § 3553(a)(1)-(7).

      As the Supreme Court explained in *Gall*,

> "a district court should begin all sentencing proceedings by correctly
> calculating the applicable Guidelines range.  As a matter of
> administration and to secure nationwide consistency, the Guidelines
> should be the starting point and the initial benchmark.  The
> Guidelines are not the only consideration, however.  Accordingly, after
> giving both parties an opportunity to argue for whatever sentence they
> deem appropriate, the district judge should then consider all of the §
> 3553(a) factors to determine whether they support the sentence
> requested by a party.  In so doing, he may not presume that the
> Guidelines range is reasonable.  He must make an individualized
> assessment based on the facts presented."

*Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citations and punctuation omitted).

      Therefore, the Court must consider the guidelines as "one factor among

several" to § 3553(a) requires courts to consider.  *Kimbrough v. United States*, 552

U.S. 85, 90 (2007); see also *Booker*, 543 U.S. at 260.  Additionally, the Court must

recognize "that imprisonment is not an appropriate means of promoting correction

and rehabilitation."  18 U.S.C. § 3582(a).

The Court cannot place a limitation on the information provided by a defendant to help the Court craft the appropriate sentence.  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.

The "most fundamental flaw [of the sentencing guidelines] is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."  Terry Carter, *Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.  Therefore, the Court must consider evidence of Zabavsky's character.

District Courts impose a sentence below the Guidelines range through either a departure or a variance.  *Izirarry v. United States*, 553 U.S. 708, 714 (2008).

> A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves.  If is frequently triggered by a prosecution request to reward cooperation… or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense.  A "variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)."

*United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012).

In this matter, a below-guidelines sentence is appropriate, whether through a variance or a departure.

A. Zabavsky Must Be Granted a Downward Departure for
   Susceptibility to Abuse in Prison

The Court must grant a departure based on Zabavsky's susceptibility to
abuse in prison.  "The extraordinary notoriety and national media coverage of this
case, couples with the defendant[]'s status as [a] police officer, make [him]
unusually susceptible to prison abuse." *Koon v. United States*, 518 U.S. 81, 113
(1996).  This case has received extensive press coverage.  Furthermore, a number of
members of the Kennedy Street Crew, which Karon Hylton-Brown may have been
associated with, but which nonetheless controlled the territory where the incident
in this matter took place, have recently been sentenced to imprisonment in the D.C.
District Court.  Sentenced members of KDY were present at the scene of the
collision, a factor which increases the susceptibility that Lt. Zabavsky faces for
abuse in prison.  For that reason, the Court must grant a downward departure for
Zabavsky's susceptibility to abuse in prison.


B. The Court Should Grant a Downward Departure for Zabavsky's
   Service to the Community.

The Court should grant a further downward departure due to Zabavsky's
service to the community.  Despite his family's status co-owning the Viktor Kramlin
Bookstore, where Zabavsky worked in his youth, he chose to serve his community
and joined the Metropolitan Police Department in 2001.  There, he served on the

MPD with distinction for over twenty years, eventually earning the position of Lieutenant on merit.

On June 27, 2024, Zabavsky received from the Court a letter it had received from Community Impact Statement from the community group 5D Court Watch. Exhibit 1.  Kathy Henderson, writing for 5D Court Watch, requested that the Court grant Lieutenant Zabavsky "maximum leniency and consideration" in sentencing, as Zabavsky "never failed to stand up for the community."  Exhibit 1.  This unsolicited letter to the Court demonstrates that Zabavsky went above and beyond to help the citizens of Washington, D.C., well prior to his arrest and indictment.

The actions taken by Zabavsky in service to the citizens of Washington, D.C. are the sort of actions which have "a dramatic and positive impact on the lives of others" and therefore warrant a departure for good works.  *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005).

C.  The Court Should Grant Zabavsky a Variance Based on Poor Health

The Sentencing Guidelines and the Court's decisions permit variances on the basis of a defendant's poor health.  *U.S. v McFarlin*, 535 F.3d 808, 811 (8th Cir. 2008).  The sentencing report notes Zabavsky's poor health, specifically that he has ongoing knee issues, has lost multiple teeth to bruxism, and high blood pressure. Furthermore, Zabavsky suffers from insomnia from the events of October 23, 2020.

For those reasons, Zabavsky should be granted a downward variance on account of his poor health.

### D. Zabavsky Should be Granted a Downward Variance Due to His Responsibilities to Care for his Mother

The Court must grant a downward variance due to Zabavsky's familial responsibilities in caring for his mother, who suffers from dementia.  Lt. Zabavsky and his sister, Natalie Vangorder, share the role of caretaker of his mother, Desanka Zabavsky.  Exhibit 2.  Ms. Vangorder cannot serve as a full-time caretaker for Ms. Zabavsky, nor can Ms. Zabavsky afford a nursing home.  As Ms. Vangorder wrote, "Without my brother assisting me I would be forced to leave my job to take care of my mother full time without any paycheck to support myself."  Exhibit 2. The widespread hardship that would result from Zabavsky's imprisonment indicates that the Court should grant Zabavsky a sentence that enables him to serve as a full-time caretaker for his mother.

### E. The factors identified in 18 U.S.C. § 3553(a) indicate that a downward variance is warranted.

18 U.S.C. § 3553(a)(2)(B) provides that a sentence must afford adequate deterrence to criminal conduct.  The two types of deterrence are specific and general deterrence; specific deterrence serves to prevent a defendant from committing crimes in the future, while general deterrence serves to keep others from

committing the crime of which defendant was convicted. *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010).

In this matter, general deterrence is not a substantial factor. This case is unique, and the factors underlying Lt. Zabavsky's conviction are so specific as to mean that the importance of any form of general deterrence is low. The mere prosecution of this case, combined with the media attention surrounding it, serves as a form of general deterrence for other police officers who may be in a similar situation as Lt. Zabavsky. *Wayte v. United States*, 470 U.S. 598, 607, 105 S.Ct. 1524, 85 L.Ed.2d 547 (1985) (observing that a prosecution itself has a "general deterrence value").

Factors for specific deterrence also support a lower sentence. Zabavsky has never been convicted or accused of a crime before, and in fact he served for over 20 years as a member of the Metropolitan Police Department. As a result of this prosecution, Zabavsky has lost his career, his freedom as a result of the current release conditions (including a curfew and ankle monitor), his finances, and any public goodwill associated with his name. These significant losses indicate that Zabavsky will already be sufficiently deterred from committing any criminal acts in the future.

Similarly, Zabavsky poses a very low risk of recidivism. The U.S. Sentencing Commission found that individuals in criminal history category one had the lowest rearrest rates and that older individuals have much lower recidivism rates than younger offenders. U.S. Sentencing Commission,

https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.  Zabavsky is currently 56 years old, demonstrating that he poses a very low risk of recidivism.  As such, the Court must consider the need for specific deterrence to be minimal.

> **F.  This Case is Unique and Therefore the Court Must Look Outside the Sentencing Guidelines**

18 U.S.C. § 3553(a)(6) states that a Court, when considering the sentence, must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  However, as noted in the presentence investigation report, there are no people in a similar situation.

When a case falls "outside the heartland" to which the sentencing guidelines were meant to apply, a district court's decision to vary from those guidelines is awarded the greatest respect.  *Kimbrough v. United States*, 552 U.S. 85, 89, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (citing *Rita v. United States*, 551 U.S. 338, 351, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007).  This is because the "sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission."  *Rita*, 551 U.S. at 357.

This case is unique both as applied to Sutton and to Zabavsky.[3]  Sutton was the first MPD officer in D.C. history to be charged with any murder crime. Ultimately, Sutton was found guilty of second degree murder for engaging in a pursuit that resulted in the fleeing person being struck by an oncoming vehicle. This charge has never been brought before; even the government admitted that this case is unique.

The case against Zabavsky is similarly unique.  Zabavsky was convicted of obstructing (and conspiring to obstruct) a federal investigation into a potential federal crime as a result of the pursuit.  When he arrived at the scene, Zabavsky did not possesses knowledge of the details of the pursuit.[4]  Therefore, the obstructive conduct Zabavsky was convicted of concerned items for which he did not know all of the facts.  When Zabavsky learned that Mr. Hylton-Brown would die, he affirmatively informed Captain Porter of the fact and alerted the MCS, which in turn communicated to IAD, which in turn communicated with federal authorities.

This case is unique, and therefore the sentencing factors aiming to "avoid unwarranted sentence disparities" should have minimal effect.  *United States v. Beaver*, 749 Fed.Appx 742, 749 (10th Cir. 2018) (noting that a departure based on the unique facts of a case can be warranted); see also *United States v. Walsh*, 47 F.4th 491, 497 (7th Cir. 2022) ("The district court properly homed in on the unique

---

[3] Furthermore, Courts have held that sentencing disparities between co-defendants are not unreasonable if they are not convicted of the same crimes as they are not similarly situated.  *United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009).

[4] Captain Porter testified that the engagement became a pursuit once Sutton drove the wrong way down a one-way road.  Zabavsky had disengaged by that point.

circumstances of Walsh's case in imposing a sentence that varied from the
Guidelines and from that of other defendants facing similar charges").   Lt.
Zabavsky's convicted conduct, and the underlying conduct in this matter does not
have any comparable cases throughout the nation, and therefore his sentencing
situation is "very unique."  *U.S. v. Warner*, 792 F.3d 847, 856 (7th Cir. 2015).

V.      A Term of Probation is Warranted

The Court should sentence Zabavsky to a term of probation.  A sentence of
probation serves as an adequate form of punishment that protects the community's
interests while also accounting for the unique circumstances of this case.

Judges in this district have recognized that a term of probation serves as a
proper form of sentencing, and that it does not let off a sentenced person easily.

> People are all very quick to suggest that the only real punishment is a
> jail sentence, and it's just not true. People can suffer in many different
> ways and do suffer in many different ways as a result of their conduct and
> that is something every judge, at least on this court, I believe,
> understands, and takes into account when they're fashioning the
> appropriate sentence.

*United States v. Cavanaugh*, 1:21-cr-362 (APM), Sentencing Transcript at 29. The
Supreme Court has echoed this sentiment, noting that:

> We recognize that custodial sentences are qualitatively more severe
> than probationary sentences of equivalent terms.  Offenders on
> probation are nonetheless subject to several standard conditions that
> substantially restrict their liberty.  See *United States v. Knights*, 534
> U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the
> very nature of probation is that probationers 'do not enjoy the absolute
> liberty to which every citizen is entitled' "(quoting *Griffin v. Wisconsin*,
> 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal
> quotation marks omitted)).  Probationers may not leave the judicial

23

> district, move, or change jobs without notifying, and in some cases
> receiving permission from, their probation officer or the court. They
> must report regularly to their probation officer, permit unannounced
> visits to their homes, refrain from associating with any person
> convicted of a felony, and refrain from excessive drinking. USSG §
> 5B1.3. Most probationers are also subject to individual "special
> conditions" imposed by the court.

*Gall*, 552 U.S. at 48. A term of probation thus serves as an adequate sentence when

other factors indicate that a sentence of imprisonment is not proper for the

individual defendant.

In this matter, Zabavsky's long history of public service, his mother's need for

a caretaker, and his susceptibility to abuse in prison indicate that a significant

downward departure is warranted from the range provided in the sentencing

guidelines. The Court should sentence Zabavsky accordingly to a period of 4 years

probation, which will afford the seriousness of the punishment for the crime

committed while accounting for the extenuating

VI.    Conclusion

For all of the foregoing reasons, the Court should grant Zabavsky a term of 4

years probation, where he can continue to care for his sick mother.

Dated: August 6, 2024                          Respectfully Submitted,

                                               */s/ Christopher Zampogna*
                                               Christopher Zampogna
                                               Bar No. 449851
                                               Zampogna, P.C.
                                               2101 L St NW, Ste 300
                                               Washington, DC 20037

(202)223-6635 ext. 101
caz@zampognalaw.com

*/s/ Abraham Bluestone*
Abraham Bluestone
Bar No. 1780408
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 102
ab@zampognalaw.com

*Counsel for Andrew Zabavsky*