# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 21-cr-598-PLF** |
| | : | |
| **v.** | : | |
| | : | |
| **ANDREW ZABAVSKY,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' SENTENCING MEMORANDUM

Andrew Zabavsky, an on-duty Metropolitan Police Department (MPD) lieutenant, covered up subordinate MPD Officer Terence Sutton's murder of Karon Hylton-Brown, choosing loyalty to Sutton over his badge and honor. As Hylton-Brown lay unconscious in the street in a pool of his own blood, Zabavsky and Sutton conspired to hide what Sutton had done to prevent any further investigation of the incident. For these crimes, the jury convicted both disgraced officers of Conspiracy and Obstruction of Justice – and further found Sutton guilty of Second Degree Murder. Defendant Zabavsky's outrageous conduct by a sworn MPD lieutenant warrants a substantial punishment. The Court should sentence defendant Zabavsky to concurrent sentences of 121 months imprisonment for the obstruction and 60 months imprisonment for the conspiracy, consistent with the applicable sentencing guidelines. The Court should also immediately order the defendant to report to the custody of the Bureau of Prisons upon imposing this sentence.

## I.      BACKGROUND

### a.  Factual Background

On October 23, 2020, codefendant Sutton, while on-duty as an MPD Crime Suppression Team (CST) officer, used an undercover police car to chase civilian Karon Hylton-Brown, who was riding an electric moped without a helmet. At the time, codefendant Sutton had three passenger CST officers with him, and defendant Zabavsky, Sutton's commanding MPD lieutenant,

1

was riding in a separate marked MPD SUV nearby.  The pursuit began when the officers spotted Hylton-Brown riding the moped on the sidewalk.  Codefendant Sutton attempted to initiate a traffic stop, but Hylton-Brown ignored him and drove off.  Both defendants then engaged in a police pursuit to try to pull him over; initially, defendant Zabavsky led this effort, but after several blocks codefendant Sutton took the lead and Zabavsky tracked the chase from a parallel position.

The pursuit lasted nearly three minutes and spanned ten city blocks, passing through neighborhood streets, two alleys, and multiple "STOP" signs, at one point proceeding the wrong way up a one-way street.  When codefendant Sutton took the lead in the pursuit, defendant Zabavsky kept aware of its progress through the CST team's radio communications, where he acknowledged the chase ("Seventh and Ingraham, chasing Karon on a scooter right now") and received regular updates from codefendant Sutton on their location ("He's coming back to you"). Gov. Tr. Ex. 221E (radio recording).  During the pursuit codefendant Sutton periodically accelerated to as much as 45 mph, more than double the residential speed limit.  Throughout, BWC from codefendant Sutton's front seat passenger shows that the defendant kept Hylton-Brown within the officers' line of sight, and that the officers in defendant Sutton's car had several opportunities to observe Hylton-Brown at close range.  Trial testimony established that none of the passenger officers in the defendant's car saw Hylton-Brown with a weapon or observed any indicia of him having a weapon, nor did anyone (including the defendant) articulate having seen such.  The trial testimony further established that the officers did not see Hylton-Brown commit any felony offense, nor did they have information indicating he was involved in one that evening. Because the officers recognized Hylton-Brown, one officer suggested obtaining a misdemeanor warrant for fleeing the traffic stop instead of continuing the pursuit.  Regardless, despite having

received MPD training that safety concerns, D.C. law, and MPD policy prohibit officers from engaging in police pursuits under the circumstances presented, Sutton continued the chase.

In the pursuit's final moments, defendant Sutton followed Hylton-Brown into an alley, turned off his car's emergency lights and siren, and accelerated behind the moped. When Hylton-Brown reached the street at the mouth of the alley, he was struck by an uninvolved oncoming motorist. BWC from defendant Sutton's front seat passenger shows that the crash unfolded mere feet in front of defendant Sutton's car: the force of the impact crushed the moped, ejected Hylton-Brown's body into the air, and threw him the full width of the alley. He landed in the street near a parked car where he lay unconscious, bleeding profusely from his head. An uninvolved MPD officer who happened to be patrolling nearby saw and heard the horrific crash. That officer made an immediate emergency notification to dispatch, drawing all available officers nearby to the scene to assist, and called for an ambulance.

At the moment of the crash, video evidence admitted at trial proved that defendant Zabavsky just had driven along Kennedy Street, past the mouth of the final alleyway of the chase, and was in the midst of making a u-turn to return back in that direction, presumably to head-off Hylton-Brown there. Instead, when defendant Zabavsky pulled up, he found the collision scene, with Hylton-Brown unconscious and responsive, lying in the street with blood oozing from his head:



Gov. Tr. Ex. 204 (Zabavksy BWC).  Defendant Sutton's MPD squad car was in park at the mouth

of the alley, just short of Kenney Street.  Defendant Zabavsky positioned himself nearby Hylton-

Brown's body while two of defendant Sutton's backseat passengers attempted first aid as they

waited for the ambulance.  MPD officer witnesses testified at trial that they observed that Hylton-

Brown's condition continuously worsen during this time.  Hylton-Brown never regained

consciousness, and at one point his breathing became loud, audibly ragged, and he vomited.  When

the ambulance arrived, paramedics immediately transported Hylton-Brown to a trauma center

where he later died from his overwhelming injuries.  BWC from the officers involved in Hylton-

Brown's aid show the defendant next to Hylton-Brown's motionless body throughout this time.



Gov. Tr. Ex. 101F.



Gov. Tr. Ex. 201 (Novick BWC).

After defendant Zabavsky arrived at the scene, he and codefendant Sutton quickly began the cover up of this serious, officer-involved incident. Even though a rookie officer uninvolved in the pursuit had started gathering information to write a police report, the defendants agreed that Sutton would instead prepare it, and they told the rookie to stand down. After taking charge of the

scene, both defendants deliberately avoided taking routine steps to collect evidence relevant to a serious traffic crash investigation. One eyewitness to codefendant Sutton's original attempted traffic stop tried to talk to both defendants Sutton and Zabavsky about what he had seen, but each defendant separately waved the witness away and did not take down his information or witness account. Neither codefendant Sutton, as the lead officer at the scene, nor defendant Zabavsky, the ranking MPD official, preserved the crash scene for investigators; indeed, they allowed the driver of the car that struck Hylton-Brown to leave the scene within 20 minutes of the crash. They then turned off their own BWCs, conferred privately, and left. Defendant Zabavsky designated no other MPD official to supervise the scene upon his own departure. Codefendant Sutton further compromised the integrity of the crash scene by driving his MPD car directly over the crash site, audibly crushing pieces of debris from the collision as he left. At no point did either defendant contact MPD's Major Crash Unit (MCU) or its Internal Affairs Division (IAD) to initiate an investigation by those units.

The defendants continued the cover up back at the police station. First, they misled their commanding officer, Captain Franklin Porter, about the nature of the incident by substantially downplaying its seriousness, denying that a police chase had even occurred, and omitting any mention of Hylton-Brown's critical injuries. Defendant Zabavsky also falsely implied to Captain Porter that Hylton-Brown had been a drunk driver. Both defendants also hid defendant Zabavksy's direct involvement in the incident, thereby avoiding the assignment of other, uninvolved MPD officials to address what had happened. Next, as they had agreed at the scene, and during the same time period in which an MPD officer at the hospital called the defendants multiple times with updates about Hylton-Brown's dire condition, codefendant Sutton drafted a police report that memorialized a false narrative of the incident. Despite video evidence to the contrary, his false

narrative gave the impression that no police pursuit had occurred, that officers had lost sight of Hylton-Brown and were engaged in a "canvass" of him in the area until shortly before the crash, and that the officers were wholly uninvolved with the fatal collision in any way.  Codefendant Sutton's account also described Hylton-Brown's observable injuries only as "superficial abrasions on [his] left eyebrow line," even though one of the officers who had provided first aid at the scene reviewed that language in the report and told codefendant Sutton that it was not accurate, because Hylton-Brown had clearly sustained severe head trauma.

Even after the defendants learned that Hylton-Brown's death was imminent, they continued the cover up.  When Captain Porter learned that Hylton-Brown had been fatally injured he decided to examine the BWC himself, and he asked defendant Zabavsky to identify the officers in the CST car so that he could review their BWC videos.  In response, defendant Zabavsky provided only codefendant Sutton's name—despite the fact that he had already reviewed all four of the involved CST officers' BWCs (as well as his own) and knew that the front seat passenger's camera contained the crucial evidence.  As a result, Captain Porter only learned of this key video by happenstance, when he noticed several instances in codefendant Sutton's BWC where an arm from the front seat appeared to come into view.  Throughout that night, even after Captain Porter called in IAD and MCU to investigate, defendant Zabavsky continued to hide his own involvement in the incident, which enabled him to remain engaged with those units' investigators.  Indeed, several hours later as MCU's investigation got underway, defendant Zabavsky met personally with the assigned MCU detective and sent him defendant Sutton's false draft report to use as a starting point for his investigation.  MCU in turn sent the report to IAD, whose investigators relied on it to conduct a preliminary assessment of the case that was then relayed up the MPD chain of command

and to make a referral to the U.S. Attorney's Office for prosecutorial review of potential federal civil rights charges.

Defendant Zabavsky's obstruction continued even after the U.S. Attorney's Office began this investigation. Several weeks after Hylton-Brown's death, on November 10, 2020, the defendant participated in a voluntary interview with federal investigators. *See* Ex. A. During this interview, defendant Zabavsky lied about what happened, fully downplaying his own involvement and that of codefendant Sutton. Specifically, he told the agents that Hylton-Brown had been driving drunk and "reeked" of alcohol (even though toxicology conducted with Hylton-Brown's autopsy found no alcohol in his blood), that he had disengaged from the pursuit after only a few blocks and had started to return to the police station (when the radio communications and video footage showed defendant Zabavsky remained actively engaged in the pursuit from a parallel position and never broke away to drive toward the police station), and that he only initiated a u-turn to travel back toward the mouth of the final alleyway *after* he heard the crash (when video footage proves he had already initiated this turn before the impact). He also told the agents that Hylton-Brown's injuries were minor (describing them as maybe a laceration, but not a "raspberry or anything like that"), that on scene "nobody really thought it was a major crash," and that when he was told Hylton-Brown was going to die, he thought it was a joke–despite repeated images from multiple BWCs showing him standing directly next to Hylton-Brown's motionless body as a growing pool of blood oozed from his head. At no point did defendant Zabavsky provide the agents with an honest account of events that was in any way consistent with the video recordings, radio recordings, and sworn accounts of other involved officers that were admitted as evidence at trial.

**b.  The Charges, Verdict, and Statutory Penalties**

On September 23, 2021, a grand jury returned a three-count indictment arising from this incident.  Count 1 charged defendant Sutton with Second Degree Murder in violation of 22 D.C. Code § 2103 for causing Hylton-Brown's fatal collision.  Counts 2 and 3 charged defendants Zabavsky and Sutton with obstruction of justice and conspiring to obstruct justice, in violation of 18 U.S.C. § 371 and 1512(b)(3), for their efforts to prevent MPD internal investigations of the crash and referral of the matter to federal authorities for a criminal civil rights investigation.

On December 21, 2022, following a nine-week trial, a jury found both defendants guilty on all counts.  Both defendants' posttrial motions to set aside the jury's verdict have been denied by this Court.  (ECF 526, 530).

Defendant Zabavsky now faces sentencing for his crimes.  As noted by the U.S. Probation Office, the statutory maximum penalty for is 5 years imprisonment for Count Two (Conspiracy); and 20 years imprisonment for Count 3 (Obstruction).  July 22, 2024, Final PSR ¶¶ 115, 116.

## II.    APPLICABLE LAW

### a.  General Sentencing Principles

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Once the Court calculates the defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007). To make this determination, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence, including evidence not presented to the jury, without regard to the rules of admissibility at trial. *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (citing *Rita v. United States*, 551 U.S. 338, 352 (2007)); U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

## III.    THE SENTENCING FACTORS

In this case, as described below, consideration of the U.S. Sentencing Guidelines and the statutory sentencing factors under 18 U.S.C. § 3553(a) support a substantial term of incarceration for defendant Zabavsky.  The conduct in this case is egregious:  an on-duty sworn law enforcement officer under defendant Zabavsky's supervision needlessly caused the death of an unarmed civilian, and in response defendant Zabavsky conspired with the subordinate to cover up the murder.  The defendant's criminal conduct warrants a sentence of incarceration that accounts for

his substantial betrayal of his badge and attempt to thwart justice:  121 months imprisonment for his obstruction conviction and 60 months for his conspiracy conviction, to be served concurrently. This reflects a sentence at the top of the applicable Guidelines range.

### a.   Applicable Sentencing Guidelines

The final PSR correctly calculated the defendant's Guidelines.  Counts 2 and 3 have the same Guidelines calculation.  Because these Counts involved obstructing an investigation into the underlying offense concerning Hylton-Brown's death, the base offense level is calculated using U.S.S.G. § 2X3.1 (Accessory After the Fact).[1]   In turn, because the obstructed investigation concerned a possible violation of 18 U.S.C. § 242, the guideline applicable for that crime, U.S.S.G. § 2H1.1 (Offenses Involving Individual Rights), applies.  Subsection (a)(1) of U.S.S.G. § 2H1.1 requires application of the offense level from the offense guideline applicable to any underlying offense. The underlying offense in this case was second degree murder, which, under § 2A1.2 has a base level offense of 38. Section 2X3.1, subsection (a)(1) requires a six-level reduction of the base offense level resulting in a base level offense of 32. Subsection (a)(3), however, caps the base level offense at 30.  Thus, the government and probation office agree that the following Guidelines apply:

| | |
|---|---|
| **Base Offense Level**, U.S.S.G. §§ 2X1.1, 2H1.1, 2A1.2 | **30** |
| **Adjustment for Obstruction of Justice,** U.S.S.G. § 3C1.1 | **+2** |
| **Chapter Four Adjustment**, U.S.S.G. § 4C1.1(a) and (b) | **-2** |
| **Total Offense Level:** | **30** |

At a total offense level of 30 and no criminal history, the applicable sentencing guidelines range is 91 to 121 months of incarceration for both counts of conviction.

### b.   Statutory Sentencing Factors Under 18 U.S.C. § 3553(a)

---

[1] This provision applies to Count 3 through U.S.S.G. § 2J1.2(c), which cross-references to § 2X3.1 (Accessory After the Fact).

The statutory sentencing factors support sentencing the defendant to a sentence at the top of the federal Guidelines range for his obstructive conduct.

### i. The Nature and Circumstances of the Offense Support a Sentence at the Top of the Defendant's Guidelines Range

The nature and circumstances of this offense support a significant sentence.  At the time of this incident, the defendant was a sworn police lieutenant entrusted with enforcing the law, keeping the public safe, and properly supervising his subordinate officers.   As trial testimony established, police pursuits are extremely dangerous to everyone involved as well as to those along the pursuit's path. *See, e.g.* Trial Tr. Nov. 3, 2022 (am session), at 115 (Drago test.).  Officers are trained—and MPD policy reinforces—that officers may engage in such high-risk police action only when the officer is confronted with an emergency situation that justifies the risk:  a fleeing felon, or someone who presents an imminent risk of death or serious harm to another.  *See, e.g.*, Trial Tr. Nov. 15, 2022 (am session), at 78 (Totaro test.).  Indeed, the policy in effect at the time of this incident instructed officers that police pursuits must be limited to the same circumstances that would permit the officer to fire his gun.  Gov. Tr. Ex. 401D (pursuit policy).   Defendant Zabavsky was highly familiar with the limited circumstances under which pursuits were permitted, as he had served in the roll of Watch Commander—the MPD official responsible for approving or terminating police pursuits—many times during his career.  Trial Tr. Nov. 17, 2022 (am session), at 43 (Porter test.).

Despite all this, defendant Zabavsky chose to join codefendant Sutton in a chase of Karon Hylton-Brown even though not one of these circumstances existed.   Hylton-Brown was not a fleeing felon, and trial evidence established the officers had no reason to believe that he was.  PSR ¶ 22.  There was also no evidence that he presented any immediate risk of harm to anyone else. PSR ¶ 20, 22.  As one of the CST officers in defendant Sutton's car acknowledged during the defense case, the officers first tried to talk to Hylton-Brown on a "hunch" that something might be

amiss; they knew nothing that even amounted to reasonable suspicion.  Trial Tr. Dec. 2, 2022, at

14-15.  When Hylton-Brown refused to voluntarily engage with the officers—as was his legal

right—they tried to stop him for minor traffic infractions, such as riding on the sidewalk and

operating the moped without a helmet.  And when Hylton-Brown did not stop, codefendant Sutton

– with the agreement of defendant Zabavsky, his supervising officer - chose to engage him in a

pursuit.  To allow defendant Sutton to do so under these circumstances flew in the face of all of

the defendant's training, experience, and MPD policies that were well-known to him.

That the pursuit of a helmetless moped driver would end in tragedy was wholly predictable.

As the trial made clear, however, this defendant's criminal conduct *started* with the crash that

killed Hylton-Brown, because the coverup began immediately at the crash scene.  Within minutes

of the crash, defendants Sutton and Zabavsky had taken charge of the crash scene despite both of

their direct involvement in the events that caused it.  They agreed defendant Sutton would write

the operative police report and took that responsibility away from an uninvolved officer who had

started to gather information for it.  They deliberately ignored routine procedures to preserve a

serious crash scene and collect evidence.  And they lied to their chain of command about what had

really happened: first by misleading their Watch Commander to think that this had been a minor

accident with no officer involvement, and then by writing and circulating a completely false

narrative of events, contained within defendant Sutton's falsified draft police report.

The significance of the coverup cannot be understated:  when one of his subordinate

officers caused a fatal crash that took a civilian's life, the defendant's immediate reaction—despite

being a sworn MPD lieutenant—was to cover up the facts.  This concerted effort to sweep this

entire incident under the rug highlights the defendant's disregard both for Hylton-Brown's life and

for his responsibilities as a supervisory law enforcement officer entrusted with significant state

authority.  The defendant's decision to obstruct any investigation of what happened further merits a substantial sentence at the top of his Guidelines.

### ii. The History and Characteristics of the Defendant Do Not Support a Lesser Sentence

The defendant has no prior criminal history and has been a MPD officer since 2001.  Given the facts here, however, this background does not support a lesser punishment.

A sentence at the top of the defendant's Guidelines is warranted here because it is by the very fact of the defendant's position as an MPD lieutenant that he was able to commit these crimes. He used an official MPD vehicle to participate in the unauthorized pursuit of Hylton-Brown, despite no lawful reason to do so.  He did not order his subordinate officers to disengage, despite the power to do so.  And after the crash, he used his position as the ranking MPD official on scene to cover up what had happened, misleading the senior police officials in his chain of command about the fundamental facts of what had happened, including his own involvement in it.  He conspired with codefendant Sutton to draft a false report, he distributed that false report to the specialized MPD units called in to investigate, and he continued to perpetuate a false account of events weeks later, when he met with federal criminal investigators.  The defendant was able to do all of these things only because of his job as a police lieutenant.  That he worked in a position of public service and public trust does not weigh in favor of leniency where he so significantly misused his position to commit crimes.  To the contrary, the defendant's abuse of this authority weighs against a lesser punishment here.

Finally, the fact that the defendant has no criminal history also does not warrant a lesser sentence below the applicable Guidelines.  The federal Guidelines already account for the fact that the defendant has no criminal history.  His Guidelines calculation therefore already give him full

credit for his lack of criminal history.  Because this consideration has already been accounted for, this fact alone does not support any kind of sentencing variance.

### iii. The Need for the Defendant's Sentence to Reflect the Seriousness of the Offense and Promote the Rule of Law Supports a Sentence at the Top of His Guidelines

The defendant's sentence must also reflect the seriousness of the offense to promote the rule of law. The defendant has expressed no remorse whatsoever for his crimes.  Instead, he has maintained a counterfactual narrative throughout this case, claiming that he had no idea that Hylton-Brown was seriously injured (despite myriad BWC showing the opposite), that he was fully honest with his chain of command (despite the trial testimony from Captain Porter to the contrary, as well as evidence that he disseminated defendant Sutton's false report narrative internally within MPD) and that he handled the crash scene properly (despite extensive trial evidence to the contrary).  As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration at the top of his Guidelines.

Law enforcement officers are a central part of promoting and maintaining the rule of law in this country. The defendant's crimes did significant damage to the credibility of law enforcement generally—and MPD specifically—in carrying out this essential role.  As the trial made clear, defendant Zabavsky knew that Sutton was engaging in a dangerous, unauthorized police pursuit of Hylton-Brown, all based on nothing more than a "hunch" and some minor traffic infractions.  The defendant did nothing to stop this, with deadly consequences.   And instead of honestly accounting for what happened, his own role in it, and his responsibilities as defendant Sutton's commanding officer, the defendant instead immediately tried to bury the facts to escape the consequences.  Egregious obstructive conduct like this—especially by police management— erodes the public trust in law enforcement.  Serious punishment is warranted to show that no one,

including officers like the defendant, is above the law.  A sentence at the top of the defendant's Guidelines to account for this gross misuse of his official position is therefore appropriate.

### iv. The Need for Deterrence Supports a Sentence at the Top of the Guidelines

A significant sentence at the top of the defendant's Guidelines will also provide deterrence. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).  The requested sentence will serve both here.

First, a lengthy sentence of incarceration will deter other law enforcement officers from obstructing justice.  A police officer covering up the circumstances of an on-duty death caused by a fellow officer is a grave offense and a shocking breach of public trust.  It demands a level of deterrence that conveys that this type of abuse of police power will have serious consequences.

Second, the defendant has never expressed any remorse or contrition throughout the course of this case.  Instead, he has repeatedly attempted to cast himself as the victim of a politically-motivated prosecution targeting him because he is White and because he is a police officer.  While the defendant's convictions will preclude his future employment in law enforcement, and therefore any additional crimes that abuse such a position of public trust, his baseless insistence that he is the true victim warrants a sentence that will provide specific deterrence.

### v. A Sentence at the Top of the Guidelines Will Not Cause Unwarranted Sentencing Disparities

This factor requires the Court's sentence to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  In other words, defendant Zabavky's sentence should

be comparable to that of other law enforcement supervisors who impeded the investigation of a death resulting federal civil rights offense (which is offense conduct amounting to second degree murder).  Although, admittedly the government has not identified identically situated offenders, sentencing data does provide some useful and objective benchmarks.

First, between 2015 and 2023, the most recent year for which data is available, the average imprisonment length for sentences calculated using guideline § 2A1.2 (Second Degree Murder), which is the guidelines driving defendant's sentence, is 248 months, but data accounting for the 6-level reduction required by §2X3.1 (Accessory After the Fact) is not immediately available.[2]  If 248 months is presumed to be at the midpoint of the applicable guidelines, however, that that is roughly equivalent to Offense Level 37. Taking six levels off that, the middle of the guidelines range at Offense Level 31 (just one above that applicable to the defendant) is approximately 121 months – the same as the government's proposed sentence.

In contrast, the average imprisonment length for sentences calculated using guideline § 2J1.2 (Obstruction) is 26 months, but that does not account for the underlying offense being obstructed, as is required here.   It follows, however, that a sentence of incarceration between at least 26 months and 121 months would be one way to avoid any sentencing disparities for related, if not identical conduct– and given that the defendant's conduct obstructed the most egregious of offenses, a sentence at the high level of that range, consistent with the guidelines specifically applicable to defendant Zabavsky, is appropriate.

The even more limited qualitative data available also supports the Government's request. The government has been able to identify at least one recent case in which a defendant was

---

[2] The referenced sentencing data is available using the United States Sentencing Commission's Interactive Data Analyzer, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard.

sentenced for obstructing an investigation into a death-resulting offense committed by another individual.  In *United States v. Xavier Pinckney*, 23-cr-00024 (D. S.C. May 23, 2024), a South Carolina defendant was sentenced to 45 months in prison for providing false and misleading information to state authorities investigating the murder of a transgender woman.  Unlike defendant Zabavsky, however, the defendant pleaded guilty and accepted responsibility for his conduct.  And, also unlike defendant Zabavsky, the defendant was not the law enforcement officer responsible for investigating the offense that he obstructed.

Individuals cloaked in and exercising state power like defendant Zabavsky should face higher penalties for their conduct, as the law has long recognized.  The federal sentencing guidelines reflect this by making it clear that an officer who violates the law should expect a greater punishment than a civilian who engages in the same misconduct.  *See* generally U.S.S.G. § 2H1.1(b); see also *United States v. Webb*, 214 F.3d 962, 965 (8th Cir. 2000) (the § 2H1.1(b) enhancement was "justified on the wholly independent ground that [the defendant] was a 'public official' at the time of the offense.") (citing *United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999)); *United States v. Hickman*, 766 F. App'x 240, 251 (6th Cir. 2019) (same).  And given the substantive factual differences between defendant Zabavsky and the officer in *Pinckney*, a sentence at the top of the Guidelines would acknowledge the material differences between these cases, and would not create an unwarranted disparity.

## IV.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).  The MVRA does not apply to the conduct that gave rise to the defendant's convictions, and the government is not seeking restitution for these counts.

## V.      FINE

Each of defendant Sutton's felony convictions subject him to a statutory maximum fine of $250,000.  22 D.C. Code § 3571.01(b)(12) (Count 1); 18 U.S.C. § 3571(b)(3) (Counts 2 and 3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.  *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d).  The government is not seeking a fine in this case.

## VI.     CONCLUSION

For the reasons given above, the Court should impose a sentence of 121 months of incarceration for Count 2, and 60 months incarceration for Count 3, to be served concurrently.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

D.C. Bar No. 481052

By:   */s/ Risa Berkower*
ELIZABETH ALOI
DC Bar No. 1015864
RISA BERKOWER
NY Bar No. 4536538
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D St., N.W.
Washington, D.C. 20532
Phone: (202) 252-7212 (Aloi)
       (202) 252-6782 (Berkower)
Email: Elizabeth.Aloi@usdoj.gov
      risa.berkower@usdoj.gov