**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | Case No: 1:21-cr-598-PLF |
| v. | : | |
| | : | Judge Paul L. Friedman |
| TERENCE SUTTON, et al. | : | |
| | : | |
| Defendants. | : | |

<u>**ANDREW ZABAVSKY'S REPLY MEMORANDUM IN SUPPORT
OF SENTENCING**</u>

The Government's misrepresentations reached its crescendo with their opposition to Zabavsky's sentencing memorandum. The Government, in its Reply in Support of Sentencing, continues to falsify and distort the facts, as well once again improperly seeking to have the Court hold the arguments raised by counsel against a defendant personally. One of these many facts, for instance, is that Zabavsky's mother has dementia and that Zabavsky cares for her. For those reasons, the Court must reject the Government's request for an unconstitutional sentence. U.S. Const. Amend. VIII.

I.      **The Government Purposefully Misstates the Facts of the Case and the Evidence at Trial**

Remarkably, the Government incorrectly argues that the recitation of the evidence provided in Zabavsky's sentencing memorandum should result in an enhanced sentence because of the statements and arguments made by counsel. The Government's insistence on this tired argument demonstrates a personal animus

towards the Defendants and counsel unbefitting their role as representatives of the Government.  The arguments of counsel are not those of the defendant, a fact which counsel for Zabavsky request that the Court consider when imposing a sentence.[1]

The evidence established at trial, and found by this Court, demonstrate the accuracy of Zabavsky's recitation of the facts of this case in his sentencing memorandum.

The prosecutors' attempts to claim that Zabavsky knew that Hylton-Brown would die when Hylton-Brown was injured at the end of the alleyway are belied by the facts presented at trial.  Lt. Zabavsky never saw the impact of the car with Mr. Hylton-Brown's scooter; he only saw the injured Hylton-Brown being treated by several officers.

At the station, Officers Sutton and Novick communicated with Officer Ernie Davis, who was at the hospital and tasked with informing the Crime Suppression Team officers the updated health status of Karon Hylton-Brown.

During the trial, Officer Novick testified to the calls.  Specifically, Officer Novick recalled that he relayed to Lt. Zabavsky that Hylton-Brown had no brain activity.  Novick testified that Zabavsky "was a bit taken back by that information and then wanted to talk to Officer Davis himself.  So I utilized my phone and called Officer Davis and handed my phone to the lieutenant."  Trial Transcript, Dec. 1, 2022 PM, at 27:1-4.

---

[1] An exception to this are the statements made by government attorneys, who speak for the United States Government in this action.

Novick testified that after his conversation with Ofc. Davis, "The lieutenant handed by back my phone and said something to the effect of I need to go notify the watch commander, and he left the office."  Trial Transcript, Dec. 1, 2022 PM. At 28:15-17.

Officer Al-Shrawi, another member of the crime suppression team, testified similarly about the conversation.

```
 1              THE COURT:  Davis called and talked to Novick.
 2    Did Novick tell you what Davis said?
 3              THE WITNESS:  Yes, it was on speaker.
 4              THE COURT:  What?
 5              THE WITNESS:  It was on speaker phone.
 6              THE COURT:  So you heard what Davis said?
 7              THE WITNESS:  Yes.
 8              MR. HANNON:  Thank you, Your Honor.
 9    BY MR. BASET
10       Q.   What did he say?
11       A.   Along the lines that it's not looking good,
12    something like that.
13       Q.   Do you recall him giving a more descriptive -- was
14    he more descriptive about Mr. Hylton-Brown's injuries?
15       A.   Yes, he then said it was more critical.
16       Q.   Did he indicate what kind of medical treatment was
17    being provided to him?
18       A.   I believe a breathing tube.
19       Q.   Was Mr. Zabavsky present at the time that Mr. Davis
20    was saying this over the speaker phone?
21       A.   Yes.
22       Q.   What about Mr. Sutton?
23       A.   Yes.
24       Q.   What about Officer Tejara?
25       A.   Yes.
```

```
 1       Q.   Did anyone react?
 2       A.   Yeah.  Lieutenant Zabavsky said he had to notify
 3    major crash.
```

Trial Testimony, November 10, 2022 PM, at 134:135.

Based on the testimony and evidence adduced at trial, Zabavsky acted based on his knowledge, and, upon learning that Hylton-Brown would likely die, Zabavsky immediately informed major crash that Hylton-Brown would die. Therefore, the recitations to that effect in Zabavsky's Memorandum in Support of Sentencing were accurate as proven by trial testimony.

Second, the government further erred in its claim that Zabavsky disengaged from what would become a pursuit. The government does not dispute that Zabavsky was not following Mr. Hylton-Brown when he went the wrong way down a one-way road.

Captain Porter, Zabavsky's supervising officer who made the ultimate determination that it was a chase, testified that:

> What made me decide that it was definitely a chase is at one point they went down a one-way street going the wrong way. At that point they did turn the overheads with their emergency lights on. But as soon as I saw that, I think I mentioned it to Lieutenant Zabavsky. I said now they going down a one-way street and I said that this is definitely a chase.

Trial Testimony, Nov. 17, 2022 AM, at 79:14-17. The watch commander determined that the pursuit began when Sutton turned the wrong way down a one-way road.[2]

---

[2] Despite Captain Porter reaching the conclusion that Sutton engaged in a pursuit, Porter did not commission the creation of a PD 845 report as required by General Order 301.03, the General Order on Vehicular Pursuits. This failure exhibits the systematic noncompliance of the entire Metropolitan Police Department with the provisions of this general order which was used to evidence Zabavsky and Sutton's intent.

The noncompliance with G.O. 301.03 extends to the entire MPD, which failed to create any report required by Section VI.1.3 of the General Order for the five-year period before October 23, 2020. Declaration of John Knutsen, Dkt. 224-1, at 2.

*Id.* Following the initiation of the pursuit, Zabavsky did not interact with Hylton-Brown or communicate to Sutton.

After Hylton-Brown and Sutton turned up an alleyway towards Jefferson, Zabavsky did not speak in the CST radio channel. Instead, Zabavsky drove up 5th before turning left onto Kennedy. The last communication made on that channel ended at 10:11:03, approximately 27 seconds prior to the collision which occurred at 10:11:30. Gov. Ex. 603. In that communication, Ofc. Sutton stated "Going back on 8th Street… what uh… South." *Id.*

The best witness to provide a comparison for Lt. Zabavsky's knowledge as to whether Sutton and Hylton-Brown were in the alleyway directly before the collision would be Mr. Urrutia-Chavez, who drove the vehicle that struck Mr. Hylton-Brown. Before the collision, Mr. Chavez passed Lt. Zabavsky at the corner of 8th and Kennedy.

Mr. Chavez, with the assistance of a translator, testified as follows.

---

This deliberate indifference on the part of MPD towards G.O. 301.03 demonstrates that the department did not properly train Zabavsky or Sutton in the requirements of engaging in a vehicular pursuit. That fact signifies that the Court should sentence Zabavsky to a lesser sentence in this matter.

```
10        Q.   Now, you testified that you didn't even see the

11   scooter coming.  You just heard the crash, is that right?

12        A.   That's right.

13        Q.   You didn't even see any police emergency lights,

14   did you?

15        A.   No.

16        Q.   You didn't hear any police emergency sirens, did

17   you?

18        A.   No.
```

Trial Transcript, Nov. 30, 2022 AM, at 32:10-18.  Based on the testimony and evidence produced at trial, a person driving towards the alleyway on Kennedy Street, NW would not know that Mr. Hylton-Brown or Ofc. Sutton were driving up that alleyway because they could not see either of them.  *Id.*

Moreover, the government in its closing statement even admitted that a person driving on Kennedy Street would have no knowledge that Sutton or Hylton-Brown were in the alleyway.

> The driver of the Scion, who was driving up Kennedy at the time, told you he had no idea what was coming his way.  And how could he have? The emergency lights and sirens that would have warned him were shut off when Sutton drove into that alley.

Trial Transcript, Dec. 14, 2022 AM. At 23:20-24. Setting aside the flawed logic of the government, no evidence exists that Zabavsky knew that Sutton and Mr. Hylton-Brown were driving down that alleyway.  Importantly, the jury did not need to make a determination regarding Zabavsky's knowledge of their presence in the alleyway to make its decision, nor did that jury make that determination.

The government's mischaracterization of the evidence is once again further exasperated by its misplaced insistence on a "u-turn" prior to the collision when no "u-turn" existed.  In fact, after the government's rebuttal closing, at Zabavsky's request the Court issued a correcting jury instruction that the statements of counsel do not constitute evidence in this matter.

The evidence at trial unequivocally demonstrated that Zabavsky's vehicle began a leisurely turn down 8th Street prior to the collision, after which point it entered into a three point turn.  Dkt. 415.  Agent Ricardi, a key government witness and member of the prosecution team, merely testified that Zabavsky was "initiating the turn" prior to the collision. Trial Transcript, Oct. 28, 2022 AT, at 70:8.  The government's misplaced insistence of a u-turn, made in contradiction to the testimony at trial and the evidenced, demonstrates that Zabavsky must be granted a reduced sentence. Gov. Ex. 309.

Zabavsky's body worn camera footage further shows that he did not intend to turn back East on Kennedy Street, NW at the time of the collision.



Gov. Ex. 204. At approximately the time of the collision, Zabavsky engaged in a leisurely left turn with only one hand on the wheel. If Zabavsky intended to engage in a "u-turn" as the government baselessly insists, he would not have one relaxed hand on the wheel as he engaged in the turn. Therefore, the government's characterization fails and Zabavsky's statements to Agent Riccardi were truthful.

The government's claim that Zabavsky knew the specific details of Sutton's role in the pursuit is similarly incorrect. Based on the testimony of Mr. Urrutia-Chavez, Zabavsky could not have known Sutton's actions in the alleyway. As such, Zabavsky did not know of the acceleration that the government placed great emphasis on. Zabavsky did not know the manner of Sutton's driving, as he did not follow or see their vehicles after they turned up an alley from Ingraham towards

8

Jefferson.  Zabavsky was not following Sutton at the time that Ofc. Sutton turned down a one-way road.  For that reason, the government's misstatements fall apart upon examination of the record at trial.

## II.    Zabavsky Must Be Sentenced at a Base Level of 14

The governments use of false and excluded evidence in an effort to sentence Zabavsky to an unconstitutionally harsh sentence, made misstatements and overgeneralizations in its sentencing memorandum and response to Zabavsky's memorandum.  The government once more goes low and threatens the defense with punishment for making legal arguments.[3]  Incredulously, without any prevailing legal arguments the government continues to make up facts to suit its purposes, for example the idea of a u-turn where none exists.

As an initial matter, the government misstates the crime for which Zabavsky was found guilty.  In its reply in support of sentencing, the government once more purposefully misstates the crime as an obstruction of "the underlying offense, for which codefendant Sutton was convicted... second degree murder.  And, certainly, defendant Zabavsky was an accessory after the fact to that crime, given his conviction for attempting to cover it up."  Dkt. 640, at 7; see also Dkt. 327, at 2. Instead, the crime at issue, and for which Zabavsky is being sentenced, is obstruction of the investigation of a *potential* civil rights offense.

---

[3] Brian A. Sun, *The Overzealous Prosecutor*, Vol. 18, No. 2, White Collar-White Powder, ABA (1992), p. 38 "Defense counsel... must use every means available to discredit... the prosecution's case."

Zabavsky has not waived his arguments that were brought forth as objections to the draft presentence reports.  Dkt. 534 (Under Seal).  In those oppositions. Zabavsky argued that there cannot be an underlying offense of the obstruction charge.

> Regarding the obstruction charge, the Court has stated that:
>
> As an initial matter, defendants are not charged with committing a civil rights violation.  They are charged with engaging in misleading conduct with the intent to hinder communications to authorities who <u>might</u> investigate the matter as a civil rights violation… The government need only charge and prove possible existence of a federal crime."

Dkt. 318, at 8.  In accordance with this definition of obstruction of justice, at trial the government never alleged that there was an actual civil rights violation, instead only demonstrating that AUSA Ahmed Based informed investigators that their investigation was a civil rights investigation.  Trial Transcript, Oct. 28, 2022 PM, at 65.  Trial Transcript, Nov. 7, 2022 PM, at 100-101.

The sentencing guidelines provide for the Accessory After the Fact cross-reference "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense."  U.S.S.G. §2J1.2(c)(1).  The government never alleged that there was an actual federal offense, so the jury could only find that there was an investigation into a *potential* federal offense.  The guidelines do not provide for the cross-reference in application to a potential underlying offense, and therefore the cross-reference is inappropriate.

In the alternative, in the event that the Court determines that there is an underlying offense, it cannot be second degree murder because you must apply the

federal law for involuntary manslaughter. The maximum sentence in a matter must be based solely on the basis of facts reflected in the jury verdict or admitted by the defendant. *Blakely v. Washington*, 542 U.S. 296, 303 (2004). Here, the jury was instructed that "the government need not prove that any person was actually guilty of any underlying federal offense." Trial Transcript Dec. 13, 2022 PM, at 46:23-25. Therefore, the underlying offense does not have to be second degree murder in D.C. local statute, as the government claims. Instead, as proven in Zabavsky's sentencing memorandum, the Court must looked at the underlying conduct under federal law i.e. THE FEDERAL LAW FOR INVOLUNTARY MANSLAUGHTER,

Examining Sutton's conduct under federal criminal law, it follows that the underlying offense would be federal involuntary manslaughter, which contains a base level of 12. Neither Sutton nor Zabavsky had the necessary *mens rea* for second degree murder under the federal definition. The government even acknowledged that federal involuntary manslaughter may be appropriate in a footnote in its response to Sutton's sentencing memorandum.[4] 18 U.S.C. § 1112 (Involuntary manslaughter is the "unlawful killing of a human being without malice" "in the commission of an unlawful act not amounting to a felony, or in the commission in an lawful manner, or without due caution and circumspection, of a lawful act which might produce death").

---

[4] While the government stated that involuntary manslaughter may be appropriate, it claimed a base level of 22 would be appropriate. Zabavsky notes that this would result in a base level of 16, as the accessory after the fact cross-reference lowers the underlying offense level by 6.

The government's false claim that there must be a cross-reference through the civil rights violation provision in §2H1.1 fails because the government never alleged or proved a civil rights violation and thus Zabavsky cannot have his maximum sentence increased for a civil rights violation. *Blakely v. Washington*, 542 U.S. 296, 303 (2004). Even if the Court errs and determines that there should be an underlying offense, it should not include a cross-reference to §2H1.1 (Offenses Involving Individual Rights) for the above reasons.

The government further seeks to improperly sentence Zabavsky through its seeking of a 2-point increase for Obstruction of Justice per §2J1.2 due to a misquoted interview by Ricardi. The government claim that the November 10, 2020 interview with Agent Ricardi substantially interfered with their investigation lacks merit.

MPD's IAD notified the US Attorney's Office on October 27, 2020, less than a week following the collision, that they had added Lt. Zabavsky to the investigation and that he would be included in the presentment package. Zabavsky Ex. 197. Despite the government's unfounded claim that it did not know of Zabavsky's involvement until much later, the U.S. Attorney's Office knew of Zabavsky's involvement less than a week following the incident. Furthermore, the grand jury proceedings initiated in early December, 2020 included questions directed towards Zabavsky's involvement in the police action. Therefore, from the beginning of the government's investigation into the October 23, 2020 incident, they were aware of Zabavsky's involvement.

Additionally, the standard the government seeks the Court to apply an incorrect standard in determining whether to apply this adjustment.

> In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

U.S.S.G. §3C1.1 n.2.  The government improperly refuses to credit that any alleged misstatements may be the result of mistake or confusion and not a "willful attempt to obstruct justice."

The guidelines further state that conduct ordinarily not covered by this section includes "making false statements, not under oath, to law enforcement officers, unless" those statements "significantly obstructed or impeded the official investigation or prosecution of the instant offense."  U.S.S.G. §3C1.1 n.5(B); n.4(G).  As defined in this section, "material" is "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."  U.S.S.G. §3C1.1 n.6.

The government's description of the report further seeks to mislead the Court as to Zabavsky's statements to Agent Ricardi.  Contrary to the government's assertion that Zabavsky described Hylton's injuries as "minimal," the memorandum of investigation written by Agent Ricardi states that "Lt. Zabavsky said Hylton maybe had a laceration but he did not see a 'raspberry or anything like that.'"  Ex. 1.  This statement, contrary to stating "minor" injuries, demonstrates that Zabavsky could have observed a severe injury to Zabavsky.   Once more, the government

interprets language in a way that shocks credulity of their incorrect arguments. A "raspberry" is merely a minor injury, and Zabavsky's denial indicates that he did not see a minor injury. Dkt. 640, at 9.

Similarly, unlike the government's mischaracterization, the statement that Hylton-Brown "reeked" of alcohol maintains factual support at trial. At the time of his death, Mr. Hylton-Brown had a number of drugs in his system, including THC, oxycodone, and acetone.[5] Acetone is an alcohol. Furthermore, testimony at trial demonstrated that Mr. Hylton-Brown was intoxicated.

Q: And do you remember her [Officer Pitt-O'Neil] telling you that she thought he was high or intoxicated?

A: Yes

Trial Transcript, Oct. 31, 2022 PM, at 25:24-26:1. Officer Pitt had previously seen Mr. Hylton-Brown multiple times throughout the day, including observing him almost getting into a fight with another individual in an area where Mr. Hylton-Brown did not normally go. Trial Transcript, Nov. 28, 2022 PM, at 53:18-24. Officer Pitt also observed and relayed to the CST team that Mr. Hylton-Brown appeared to be intoxicated with glossy eyes. Trial Transcript, Nov. 28, 2022 PM at 75:1-5, 58:19-24.

---

[5] The government's assertion that the toxicology report revealed that Mr. Hylton-Brown had no alcohol in his system when he died is unsupported by the discovery provided, which has been extensively briefed in response to Zabavsky's *Brady* motion. The materials accompanying the toxicology report revealed that Mr. Hylton-Brown had acetone, an alcohol, in his body at the time of his death.

Officer Novick, an officer who treated Hylton-Brown prior to the arrival of EMTs, testified that Hylton-Blood's vomit smelled of alcohol.

> Q: You also saw him vomit, is that accurate?
>
> A Yes.
>
> Q: And you smelled his vomit as well as, is that accurate?
>
> A: I did.
>
> Q: And it smelled of alcohol?
>
> A: To my recollection, yes.

Trial Testimony, Nov. 14, 2022 PM, at 111:12-17. Therefore, Zabavsky's comments regarding whether Hylton-Brown's vomit smelled of alcohol maintain factual support in the record and were not materially misleading to investigators.

The testimony and evidence adduced at trial also support Zabavsky's alleged comment that "nobody really thought it was a major crash." Officer Toth, a uniformed officer not in the Crime Suppression Team, arrived at the scene and, after seeing what had occurred, called for an ambulance. The operator determined that the incident was not life-threatening based on Officer Toth's description of the incident and Hylton-Brown's injuries. Gonthel Tolliver, the EMT who arrived at the scene, testified to this effect.

> A: I believe it was a priority 2.
>
> Q: What does that mean?
>
> A: Serious, but not life threatening.

Trial Transcript, Nov. 1, 2022 PM, at 57:21-23.  The impression of another officer who arrived at the scene shortly following the collision portrayed the injuries as non-life threatening.  Therefore, the testimony and evidence at trial showed that Zabavsky's comment cannot be materially misleading.

Mr. Hylton-Brown's condition unfortunately worsened quickly as he was moved from the scene, after Lt. Zabavsky last observed him.  The fact that Mr. Hylton-Brown's injuries worsened quickly as he was moved from the scene to the hospital is supported by the description of his Glasgow coma score, a system used by first responders to measure the mental status of a patient.  Ms. Tolliver testified that dispatch gave Mr. Hylton-Brown an initial Glasgow score of13 based on the report it received, meaning that his mental state was altered but he was conscious. Trial Transcript, Nov. 1, 2022 PM, at 82:5-6.

When Ms. Tolliver arrived at the scene, she described Mr. Hylton-Brown's mental state as a 9 on the GCS, indicating that he was unconscious.  *Id.*, at 14-17. Ms. Tolliver testified that when they reached the hospital, well after Lt. Zabavsky had last seen Mr. Hylton-Brown, she would rank him as a 3 on the Glascow come score, indicating that he was comatose.  *Id.*, at 83:25.  However, Ms. Tolliver did not input that score into any reports.

The medically-trained personnel's analysis of Mr. Hylton-Brown demonstrates that, while he may have been unconscious, those at the scene would not have necessarily known that he would ultimately die as a result of his injuries. The MPD general orders state that a police officer should call major crash when

someone may die and must make a personal assessment to do so.  Trial Transcript, Dec. 9, 2022 AM, at 46:15-24.  Multiple people at the scene made assessments that Hylton-Brown may not have died as a result of the injuries, and therefore Zabavsky did not materially mislead investigators when stating that he did not initially think it would be a major crash.

The Court cannot place the obstruction of justice enhancement when the enhancement would cover conduct contained within the sentenced obstruction of justice charge.  In oral argument during the trial, AUSA Baset stated that the conspiracy to obstruct justice and the obstruction of justice in this matter occurred "until the point of the indictment."  Trial Transcript, Nov. 9, 2022 AM, at 38:9-10. Therefore, pursuant to note 7, "this adjustment is not to be applied to the offense level" barring a "significant further obstruction," which the guidelines exemplify by the defendant threatening a witness during the course of the prosecution for the obstruction offense.  U.S.S.G. §3C1.1 n.7.

The evidence demonstrates that Zabavsky did not conduct a "significant further obstruction" that would warrant an adjustment under this section, the Court must not increase his offense level by 2 for the further obstruction of justice.

For all of the foregoing reasons, Zabavsky's offense level should be calculated as follows:

| Guideline Provision | Description | Offense Level |
|---|---|---|
| §2J1.2 | Obstruction of Justice | 14 |
| §3B1.2(a) | Minimal Role in the Offense | -4 |
| §3C1.1 | Obstructing or Impeding the Administration of Justice | +/- 0 |
| **Adjusted Offense Level** | | **10** |
| §4C1.1 | Adjustment for Certain Zero-Point Offenders | -2 |
| §3E1.1 | Adjustment of Acceptance of Responsibility | -2 |
| **Total (Range)** | | **6 (0-6 months)** |

## III.    Zabavsky Is Entitled to a Downward Departure or Variance of His Sentence

The Government's efforts to prevent Zabavsky from receiving warranted departures and variances exemplify its overzealous[6] attempts to unconstitutionally sentence Zabavsky.

The case the government cites to improperly deny Zabavsky's entitlement to an acceptance of responsibility adjustment under §3E1.1 fails to support its point. While, in 1993 the sentencing guidelines may have told judges that they should not provide reductions to a defendant who does not plead guilty, in the 31 years since

---

[6] *United States v. Thao*, 2022 WL 1468455, at 4 (D.M.N. 2022) (This Court views the Government's conduct in this case… as frighteningly close to the line of overzealous prosecution).

the sentencing guidelines have undergone significant revisions. "Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." U.S.S.G. §E1.1 n.2. The guidelines explicitly state that an acceptance of responsibility may occur when a defendant challenges the applicability of a statute to his conduct. *Id.*

In this case, Zabavsky only brought 2 witnesses in his case and chief: a character witness and an expert to discuss the applicability and mechanisms of a general order. Zabavsky did not challenge the established factual allegations brought by the government, but rather their applicability to the relevant statutes: 18 U.S.C. § 371, 18 U.S.C. § 2, 18 U.S.C. § 1512(b)(3), and 18 U.S.C. § 1515.

For those reasons, Zabavsky is entitled to a 2-point reduction for acceptance of responsibility.

The government's argument against a departure due to Zabavsky's susceptibility to abuse in prison is similarly unavailing. Without providing citation, the government provided a claimed statistic related to the susceptibility of abuse for police officers. However, Courts have recognized that status as a police officer involved in a publicized case makes a defendant "unusually susceptible to prison abuse." *Koon v. United States*, 518 U.S. 81, 113 (1996). This susceptibility to abuse is exemplified by Derek Chauvin, a former law enforcement official who was convicted in a well-publicized case, was stabbed in prison. Ramon Antonio Vargas, *Derek Chauvin Expected to Survive Stabbing Attack in Prison, Officials Say*, The

Guardian https://www.theguardian.com/us-news/2023/nov/26/derek-chauvin-stabbing-attack-prison.

The government's arguments on this point recklessly and without merit disregard the significant media attention in this case, which even included stories in national media about the sentencing memoranda. *Prosecutors Seek Prison Time for D.C. Officers Convicted in Fatal Chase*, The Washington Post, https://www.washingtonpost.com/dc-md-va/2024/08/07/karon-hylton-fatal-police-chase-sentence/.  As such, a departure due to Zabavsky's unique susceptibility to abuse in prison is warranted.

The Court previously took notice of Zabavsky's knee issues in the government's presence.

```
10              THE COURT:  Okay.  Can I ask Mr. Zabavsky and
11     Mr. Sutton just to come up to the podium for a second.
12          I just noticed the other day that you're limping.  Is
13     that something -- that's a long-time affliction, or is this
14     new?
15              DEFENDANT ZABAVSKY:  It started near the beginning of
16     the trial.  I blew out my knee.  I was actually hurting for
17     about two weeks, and then it got good for two weeks, and then I
18     just kind of blew it out again.
19              THE COURT:  Goodness.
```

Trial Transcript, Dec. 9, 2022 PM, at 2:10-19.  The government's presence at this acknowledgment demonstrates its long knowledge of Zabavsky's knee injuries.

Furthermore, the government's arguments regarding Zabavsky's requirements to care for his mother are heartless, cruel, and incorrect. Since the trial, Zabavsky serves as a significant caretaker for his mother who suffers from dementia. Ex. 2 (Notably, Ms. Zabavsly's medications includes Donepezil, which is used to treat Alzheimer's). Zabavsky's sister, Natalie Vangorder, cannot serve as a full-time caretaker despite being the only other potential caretaker for his mother, who suffers from dementia. Ex. 3.

Zabavsky's sister, Natalie Vangorder, signed a letter under penalty of perjury stating that she cannot afford a full-time caretaker for their mother and that she cannot become a full-time caretaker. Ex. 3. "Without my brother assisting me I would be forced to leave my job to take care of my mother full time without any paycheck to support myself and my mother." Ex. 3. Ms. Vangorder further cannot afford to continue to care for Ms. Zabavsky to the extent that she has, stating that "When my leave is exhausted, I will go into a leave without pay status." *Id*.

Despite the government's blatantly false claim that Zabavsky should have been able to "make arrangements" with his siblings, Ms. Vangorder "cannot do it on my own without uprooting my life, leaving my job, my income, my retirement not to mention my husband and be forced to live full time in another state. We cannot move her to my house as I live in a 3-story townhouse with stairs that my mother is unable to climb.' Ex. 3.

Incredulously, the government seems to imply that Zabavsky's mother may not need assistance.

> She is wobbly on her feet and tends to fall. She needs assistance getting up out of chairs. She cannot cook at all and cannot remember to eat meals. She cannot clean her house. She cannot do laundry. She cannot drive. She cannot bath herself and needs to constantly be reminder to wash her hands and brush her teeth. She leaves dirty diapers on the floor because she can't remember to put them in the trash can. She cannot remember to take her pills. She needs someone with her fulltime to make sure she takes care of her basic needs.

Ex. 3; see also Ex. 2 ("she forgets times, dates and names, and makes errors in cooking things she has made for years;" assessing her as having "moderate dementia"). Only Zabavsky can adequately care for his mother. Dementia, a neurodegenerative disease, gets worse over time, and even since her initial diagnosis Zabavsky's mother requires increasing care in treatment. The need to care for Zabavsky's mother create sufficient grounds for a downward variance in Zabavsky's sentence.

## IV.     The Uniqueness of this Case is Grounds for a Departure or Variance from the Guidelines

The government's claim that the court must embrace a strict adherence to the guidelines due to the uniqueness of this prosecution finds no support in the cases that they cited. The United States Sentencing Commission created the Guidelines in order to encourage the idea that similar offenses and offenders are treated similarly. Following *Booker*, the Guidelines are not mandatory. *United States v. Booker*, 543 U.S. 220, 264 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

The cases cited by the government belie the government's incorrect proposition that the uniqueness of this case bars a departure from the guidelines. The Court in *Molina-Martinez* stated that in the sentencing process, "the district court has discretion to depart from the Guidelines." *Molina-Martinez v. U.S.*, 578 U.S. 189, 193 (2016). Meanwhile, in *Alford*, the Court questioned whether the sentence was disproportionate to an easily identified group of people: January 6th misdemeanants. *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024). Alfrord did not claim to be unique, but rather claimed that his sentence was disproportionate. Similarly, the Court in *Otunyo* considered the question of whether Otunyo and another fraudster, Orji, were similarly situated so as to create a sentencing disparity. *United States v. Otunyo*, 63 F.th 948, 960 (D.C.Cir. 2023). Contrary to the government's claim, these cases do not stand for the proposition that the Court must enforce a strict adherence to the guidelines, but rather that each defendant must be sentenced individually in a manner to avoid disparities with similar offenders with similar offenses.

However, there are no similar offenders and no similar offenses. That neither the defendants, the government, nor the probation office can produce any demonstrates the uniqueness of this case. As such, this case falls "outside the heartland" for which the sentencing guidelines were meant to apply. *Kimbrough v. United States*, 552 U.S. 85, 89, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). This uniqueness is true even within the case, as sentencing disparities between co-

defendants are not unreasonable if they are not convicted of the same crimes. *United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009).

In fact no similar case exists and many believe that this case will be the "high water mark" of anti-police prosecutions in the United States. The limit of Zabavsky's obstructive conduct, through Zabavsky not affirmatively reporting information to his superior, asking that superior to make a determination on whether there was a technical pursuit, and by not clarifying what he meant by "we," demonstrates the truly unique nature of Zabavsky's prosecution. Zabavsky's FOIA investigation demonstrated that no similar cases exist despite the government's repeated misstatements as to the contents and significance of the findings. *See* Zabavsky's Mot. for Recons. of the Court's Order on Zabavsky's Mot. for Arrest of Judgm. Under Rule 34.

The Court should give the concern for disparities in sentencing a minimal impact in the ultimate decision on sentencing. The sentencing must fit the defendant and the unique nature of this defendant and this offense highlights that the Court cannot worry about sentencing disparities. This case exists "outside the heartland" and therefore a sentence below the guidelines is warranted.

### V. Conclusion

For all of the foregoing reasons, the Court must reject the Government's overzealous and unconstitutional attempt to sentence Zabavsky to 121 months.

Instead, Zabavsky should be sentenced to 4 years of probation to permit him to care for his mother.

Dated: August 26, 2024                    Respectfully Submitted,

*/s/ Christopher Zampogna*
Christopher Zampogna
Bar No. 449851
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 101
caz@zampognalaw.com

*/s/ Abraham Bluestone*
Abraham Bluestone
Bar No. 1780408
Zampogna, P.C.
2101 L St NW, Ste 300
Washington, DC 20037
(202)223-6635 ext. 102
ab@zampognalaw.com

*Counsel for Andrew Zabavsky*